[No. S036526. Dec. 28, 1994.]

DOMAR ELECTRIC, INC., Plaintiff and Appellant, v.
CITY OF LOS ANGELES, Defendant and Respondent;
BAILEY CONTROLS COMPANY, Intervener and Respondent.

## COUNSEL

Kamine, Steiner & Ungerer, Bernard S. Kamine and Phyllis M. Ungerer for Plaintiff and Appellant.

James K. Hahn, City Attorney, Pedro B. Echeverria, John F. Haggerty and Christopher M. Westhoff, Assistant City Attorneys, for Defendant and Respondent.

Louise H. Renne, City Attorney (San Francisco), Mara E. Rosales, Joseph S. Avila, Bill Lann Lee, Constance L. Rice and Kevin S. Reed as Amici Curiae on behalf of Defendant and Respondent.

Jones, Day, Reavis & Pogue, Gerald W. Palmer and Patricia W. Davies for Intervener and Respondent.

## OPINION

BAXTER, J.—We granted review in this case to determine whether a city charter requirement that contracts subject to competitive bidding be awarded to the "lowest and best regular responsible bidder" prevents the charter city and its agencies from requiring potential contractors to comply with a subcontractor outreach program that involves no bid preferences, set-asides or quotas. Our examination of the relevant charter provisions and the purposes underlying the goals of competitive bidding leads us to conclude that the outreach program does not violate the charter. Accordingly, we reverse the judgment of the Court of Appeal and remand the matter to allow that court to address other issues not previously reached.

### I. FACTUAL AND PROCEDURAL BACKGROUND

The City of Los Angeles (hereafter the City) is governed by a charter which ordinarily requires competitive bidding on contracts involving the expenditure of more than $25,000. (L.A. City Charter, § 386(b).)[1] With exceptions not applicable here, the charter provides that such contracts "shall be let to the lowest and best regular responsible bidder." (§ 386(f).)

On March 29, 1983, the City's mayor issued Executive Directive No. 1-B, which declared it was the policy of the City "to utilize Minority and Women-Owned Business Enterprise[s] [MBE's and WBE's] in all aspects of contracting relating to procurement, construction, and personal services."[2] The directive explicitly declared that the City, "through the City Council and

[1] Unless otherwise indicated, all further section references are to the Los Angeles City Charter.

[2] In a footnote, the directive defined minority-owned business enterprises (MBE's) and women-owned enterprises (WBE's) as "any business, bank or financial institution which is owned and operated by a minority group member or woman, or such business, bank or financial institution of whom 50% or more of it's [sic] partners or stockholders are minority group members or women. If the business is publicly owned, the minority members or stockholders must have at least 51% interest in the business and possess control over management capital earnings."

it's [*sic*] respective Boards and Commissions, will ensure that Minority Business Enterprises have the maximum opportunity to participate in the performance of contracts and subcontracts. In this regard, the City will take all responsible steps to ensure that Minority and Women-Owned Business Enterprises have the maximum opportunity to compete for and perform contracts and services." The directive also contained general guidelines for implementing this policy.

Subsequently, the United States Supreme Court decided *Richmond* v. *J. A. Croson Co.* (1989) 488 U.S. 469 [102 L.Ed.2d 854, 109 S.Ct. 706], which involved a challenge to a municipality's program that required prime contractors awarded city construction contracts to subcontract at least 30 percent of the dollar amount of each contract to minority firms. In that case, the high court found that the mandatory set-aside for minority subcontractors violated the equal protection clause of the United States Constitution because there was no direct evidence of past discrimination. Thereafter, on March 6, 1989, the Mayor of the City issued Executive Directive No. 1-C, which was "intended to clarify the implementation of Executive Directive 1-B in light of the *Richmond* v. *Croson* decision. . . ."

Although Executive Directive No. 1-C declared that the previous directive "remains intact and in force," it revised the intended policy of the City, as follows: "It is the policy of the City of Los Angeles to provide Minority Business Enterprises (MBEs), Women Business Enterprises (WBEs) *and all other business enterprises* an equal opportunity to participate in the performance of all city contracts. Bidders and proposers shall assist the city in implementing this policy by taking all reasonable steps to ensure that *all available business enterprises,* including local MBEs and WBEs, have an equal opportunity to compete for and participate in city contracts." (Italics added.) Under Executive Directive No. 1-C, contracting agencies of the City were directed to evaluate the good faith efforts made by bidders and proposers in their outreach to MBE's, WBE's and other business entities according to nine factors. Subsequent guidelines issued by the mayor's office clarified that a tenth factor, which purported to measure a bidder's good faith with reference to certain anticipated levels of MBE and WBE subcontractor participation, should no longer be considered in evaluating bids.

The Los Angeles Board of Public Works (hereafter the Board) established an outreach program patterned after Executive Directive No. 1-C. Under the Board's program, the adequacy of a bidder's good faith in conducting

subcontracting outreach efforts to MBE's, WBE's and other business enter-
prises (OBE's)[3] is to be determined by utilizing the factors listed in the
mayor's directive, including evaluations of the bidder's efforts to identify
and select specific work items in projects for subcontracting out to MBE's,
WBE's and OBE's, to conduct advertising on selected work, and to provide
information to and negotiate in good faith with interested subcontractors.[4]
Although the Board provides estimates of the level of MBE and/or WBE
participation which might be achieved in each particular bid situation (1

---

[3]The Board's program defines "OBE" to mean "any subcontractor which does not other-
wise qualify as a Minority or Women Business Enterprise."

[4]The Board's program lists 10 factors in the following order: "[¶] (1) The bidder has made
a good faith effort to obtain sub-bid participation by MBEs, WBEs and OBEs [other business
enterprises] which could be expected by the Board to produce a reasonable level of partici-
pation by interested business enterprises, including the MBE and WBE percentages set forth
by paragraph B herein. [In this case, paragraph B states: 'The subcontracting outreach policy
requires the bidder to make a "Good Faith Effort" to obtain sub-bid participation by MBEs,
WBEs and OBEs which can be expected by the Board of Public Works to produce a level of
participation by interested business, including *1* percent MBE and/or WBE.'] [¶] (2) The
bidder has attended the pre-bid meeting scheduled by the Board to inform all bidders of the
requirements for the project for which the contract will be awarded. The Board may waive
this requirement only if the bidder certifies in writing it was already informed as to those
project requirements prior to the pre-bid meeting. [¶] (3) The bidder has identified and
selected specific work items in the project to be performed by sub-bidder/subcontractors in
order to provide an opportunity for participation by MBEs, WBEs and OBEs. Upon making
this determination, the bidder subdivided the total contract work requirements into smaller
portions or quantities to permit maximum active participation of MBEs, WBEs and OBEs. [¶]
(4) Not less than ten (10) calendar days prior to the submission of bids, the bidder advertised
for sub-bids from interested business enterprises in one or more daily or weekly newspapers,
trade association publications, minority or trade oriented publications, trade journals, or other
media specified by the Board. [¶] (5) The bidder has provided written notice of its interest in
receiving sub-bids on the contract to those business enterprises, including MBEs and WBEs
having an interest in participation in the selected work items. All notices of interest shall be
provided not less than ten (10) calendar days prior to the date the bids are required to be
submitted. In all instances, bidder can document that invitations for sub-bid/subcontracting
was sent to available MBEs, WBEs and OBEs for each item of work to be performed. [¶] (6)
The bidder has documented efforts to follow-up initial solicitations of sub-bid interest by
contacting the affected business enterprises to determine with certainty whether said enter-
prises were interested in performing specific portions of the project work. [¶] (7) The bidder
has provided interested sub-bid enterprises with information about the plans, specifications
and requirements for the selected sub-bid/subcontracting work. [¶] (8) The bidder requested
assistance from organizations that provide assistance in the recruitment and placement of
MBEs, WBEs and OBEs not less than 15 calendar days prior to the submission of bids. It
should be noted that any legitimate association concerning MBE/WBE/OBE activities not on
the following list may also be contacted for this purpose. [¶] (9) The bidder has negotiated in
good faith with interested MBEs, WBEs and OBEs and did not unjustifiably reject as
unsatisfactory the sub-bids prepared by any enterprise. As documentation, the bidder can
submit a list of all sub-bidders for each item of work for which bids were solicited, including
dollar amounts of potential work for MBEs, WBEs and OBEs. [¶] (10) The bidder has
documented efforts to advise and assist interested MBEs, WBEs and OBEs in obtaining
bonds, lines of credit, and insurance required by the Board or contractor."

percent in the instant project), the program makes clear that the failure to meet the anticipated participation level shall not by itself disqualify any bidder from consideration for a contract award nor result in a determination of lack of reasonable MBE/WBE participation. Thus, a bidder gains no advantage from meeting the anticipated participation level nor a disadvantage from not meeting it.

In October 1991, the Board issued a request for bids on a contract to provide a computer control system for the Hyperion Secondary Sewage Treatment Plant. The bid package specified that bidders would be required to submit documentation of their compliance with the outreach program. In particular, the package contained a document called a "bidder's checklist" which detailed all pages of the bid required to be submitted for the bid to be considered responsive. This checklist included the statement: " 'Good Faith Effort Documentation Checklist': I have used this checklist, initialed each step and have signed the form. I will submit this checklist along with required documentation no later than three (3) City working days following the close of Board business the day bids are received." Additionally, at the bottom of the bidder's checklist was the following statement: "I have carefully read and completed each and every applicable page of the Proposal. I am aware that the failure to submit the appropriate pages of the Proposal, properly completed and signed, may render my bid non-responsive and subject to rejection by the Board of Public Works." This statement was followed by a line for the bidder's signature.

Three companies submitted bids for the project. Of these, Domar Electric, Inc. (hereafter Domar) submitted the apparent lowest monetary bid of $3,335,450. However, the bid was declared nonresponsive due to Domar's failure to timely provide the required good faith effort documentation within the three-day deadline. The Board awarded the contract to Bailey Controls Company, which had submitted the next lowest monetary bid of $3,987,622.

Domar filed a petition for a writ of mandate and/or prohibition in the superior court seeking, among other things, to prevent the City from entering a contract on the subject project with any contractor other than itself. After an alternative writ was issued, the superior court denied Domar's petition, finding that "the requirement of the MBE/WBE outreach program attachment is not illegal and/or unconstitutional or precluded by case authorities. The requirement serves an important and significant public policy which does not set any quotas or improper goals." Domar's petition for a writ of mandate in the Court of Appeal was denied, as was its petition for review.

After a final judgment was entered, Domar appealed on the grounds that: (1) the outreach program violates the City's charter; (2) the program violates

Public Contract Code section 2000, which permits compliance with an outreach program to be predicated on *either* demonstrating good faith in seeking MBE and WBE participation *or* meeting specific goals and requirements for such participation; and (3) the program is unconstitutionally race-conscious in violation of the federal equal protection clause and the holding in *Richmond* v. *J. A. Croson Co.*, *supra*, 488 U.S. 469. The Court of Appeal, in a split decision, reversed the superior court judgment. After finding that authorization for the outreach program was not expressly set forth in the charter, the appellate court determined that the Board's rejection of Domar's bid based on the failure to submit outreach documentation violated charter section 386(f), which requires that contracts be awarded to the "lowest and best regular responsible bidder." Because it found a charter violation, the court did not reach the other two contentions. We granted the City's petition for review.

## II. Discussion

The procedures and requirements relating to the competitive bidding of municipal contracts are set forth in large part at section 386 of the City's charter. Those relevant to this case are described below.

With certain exceptions not pertinent here, section 386(b) provides that the City "shall not be, and is not bound by any contract involving the expenditure of more than twenty-five thousand dollars ($25,000) unless the . . . board . . . authorized to contract shall first have complied with the procedure for competitive bidding established by this section." Notices of requests for bids must be published at least once in a daily newspaper printed and published in the City, and such notices must specify the amount of the bond to be given for the faithful performance of the contract. (§ 386(c).) "Bidders may be required to submit with their proposals detailed specifications of any item to be furnished, together with guarantees as to efficiency, performance, characteristics[,] operating cost, useful life, time of delivery, and other appropriate factors. Such notice shall specify the time and place such bids will be received." (*Ibid.*) Bids must be accompanied by a cashier's check for an amount not less than 10 percent of the aggregate sum of the bid, or, in lieu thereof, a satisfactory surety bond in like amount, guaranteeing that the bidder will enter into the proposed contract if the contract is awarded to the bidder. (§ 386(d).) The bid must also be supported by an affidavit of noncollusion. (*Ibid.*)

Section 386(f) pertains to the award of contracts, and provides in pertinent part: "At the time specified for opening of said bids, . . . the contract *shall*

*be let to the lowest and best regular responsible bidder furnishing satisfactory security for its performance.* This determination may be made on the basis of the lowest ultimate cost of the items in place and use; and where the same are to constitute a part of a larger project or undertaking, consideration may be given to the effect on the aggregate ultimate cost of such project or undertaking. Notwithstanding any other provision of this Charter to the contrary and to the extent permitted by law, the City and its various awarding authorities, including those City departments which exercise independent control over their expenditure of funds, shall not enter into or renew any contract, . . . unless the bidder is in compliance with, or the contract has been excluded or exempted from any anti-apartheid policy adopted by the City by ordinance . . . . In addition, irrespective of the provision of this subsection requiring award to the lowest and best regular responsible bidder, a bid preference can be allowed in the letting of contracts for California or Los Angeles County firms and, in addition, the bid specifications can provide for a domestic content requirement; the extent and nature of such bid preference, domestic content requirement and any standards, definitions and policies for their implementation shall be provided for by ordinance adopted by the Council . . . . The bid of any bidder previously delinquent or unfaithful in the performance of any former contract with the City may be rejected." (Italics added.)

The issue in this case is whether the charter precludes the Board from requiring bidders on public works projects to undertake good faith efforts in compliance with its subcontractor outreach program as part of the competitive bid process. At the outset, we observe that the charter contains no provision expressly allowing the City or its contracting agencies to adopt a subcontractor outreach program. ▉ Accordingly, we shall first consider whether the program is void in the absence of explicit charter authorization.

▉ We begin with the cardinal principle that the charter represents the supreme law of the City, subject only to conflicting provisions in the federal and state Constitutions and to preemptive state law. (See *Harman* v. *City and County of San Francisco* (1972) 7 Cal.3d 150, 161 [101 Cal.Rptr. 880, 496 P.2d 1248].) In this regard, "[t]he charter operates not as a grant of power, but as an instrument of limitation and restriction on the exercise of power over all municipal affairs which the city is assumed to possess; and the enumeration of powers does not constitute an exclusion or limitation. [Citations.]" (*City of Grass Valley* v. *Walkinshaw* (1949) 34 Cal.2d 595, 598-599 [212 P.2d 894] (*City of Grass Valley*); see also *Johnson* v. *Bradley* (1992) 4 Cal.4th 389, 396-397 [14 Cal.Rptr.2d 470, 841 P.2d 990].) The expenditure

of city funds on a city's public works project is a municipal affair. (*Loop Lumber Co.* v. *Van Loben Sels* (1916) 173 Cal. 228, 232 [159 P. 600] [street and sewer work]; see *Vial* v. *City of San Diego* (1981) 122 Cal.App.3d 346, 348 [175 Cal.Rptr. 647]; *Smith* v. *City of Riverside* (1973) 34 Cal.App.3d 529, 534-537 [110 Cal.Rptr. 67].)

"[B]y accepting the privilege of autonomous rule the city has all powers over municipal affairs, otherwise lawfully exercised, subject only to the clear and explicit limitations and restrictions contained in the charter." (*City of Grass Valley, supra,* 34 Cal.2d at p. 598; see *Johnson* v. *Bradley, supra,* 4 Cal.4th at pp. 396-397.) Charter provisions are construed in favor of the exercise of the power over municipal affairs and "against the existence of any limitation or restriction thereon which is not expressly stated in the charter . . . ." (*City of Grass Valley, supra,* 34 Cal.2d at p. 599; *Taylor* v. *Crane* (1979) 24 Cal.3d 442, 450-451 [155 Cal.Rptr. 695, 595 P.2d 129].) Thus, "[r]estrictions on a charter city's power may not be implied." (*Taylor* v. *Crane, supra,* 24 Cal.3d at p. 451)

██   Applying these principles, we conclude that the mere failure of the City's charter to expressly grant the power to require bidders to conduct subcontractor outreach does not render the outreach program void. However, our analysis does not stop here. ██   Even though the absence of express authorization is not fatal to the program, it is well settled that a charter city may not act in conflict with its charter. (*City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898, 923-924 [120 Cal.Rptr. 707, 534 P.2d 403]; *Currieri* v. *City of Roseville* (1970) 4 Cal.App.3d 997, 1001 [84 Cal.Rptr. 615]; *Brown* v. *City of Berkeley* (1976) 57 Cal.App.3d 223, 230-233 [129 Cal.Rptr. 1].) Any act that is violative of or not in compliance with the charter is void. (*Ibid.*)

██   In holding that the outreach program is invalid, the Court of Appeal found that the program "unquestionably purports to establish a noncharter exception to the competitive bidding requirements and exceptions set forth in section 386(f). As such, it does not conform to, is not subordinate to, conflicts with, and exceeds the charter." Domar essentially agrees with this reasoning, arguing that the requirements and exceptions enumerated in the charter are intended to be exclusive.

In determining whether the implementation of the outreach program conflicts with the charter, we employ the following rules of charter construction. First, we construe the charter in the same manner as we would a statute. (*C.J. Kubach Co.* v. *McGuire* (1926) 199 Cal. 215, 217 [248 P. 676]; *Currieri*

v. *City of Roseville, supra,* 4 Cal.App.3d at p. 1001.) Our sole objective is to ascertain and effectuate legislative intent. (*City of Huntington Beach* v. *Board of Administration* (1992) 4 Cal.4th 462, 468 [14 Cal.Rptr.2d 514, 841 P.2d 1034].) We look first to the language of the charter, giving effect to its plain meaning. (*Burden* v. *Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].) Where the words of the charter are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the charter or from its legislative history. (*Ibid.*)

Section 386 contains two subsections that specifically authorize the City to impose certain requirements upon bidders as part of the competitive bid process. Section 386(c) expressly states that "[b]idders may be required to submit with their proposals detailed specifications of any item to be furnished, together with guarantees as to efficiency, performance, characteristics[,] operating cost, useful life, time of delivery, and other appropriate factors." Section 386(f) requires that bids shall be let to the "lowest and best regular responsible bidder,"[5] but explicitly states that irrespective of this requirement, a local bidder preference may be allowed and a domestic content requirement may be included in bid specifications if provided for by ordinance adopted by the city council. Similarly, section 386(f) provides that notwithstanding any other provision of the charter to the contrary and to the extent permitted by law, the City shall not enter into any contract unless the bidder is in compliance with, or the contract has been excluded or exempted from, any anti-apartheid policy adopted by the City by ordinance.[6]

■  Since neither section 386(c) nor section 386(f) expressly authorizes or forbids the City to adopt a requirement relating to subcontractor outreach,

[5] "'The term "lowest responsible bidder" has been held to mean the lowest bidder whose offer best responds in quality, fitness, and capacity to the particular requirements of the proposed work.'" (*City of Inglewood-L.A. County Civic Center Auth.* v. *Superior Court* (1972) 7 Cal.3d 861, 867-868, fn. 5 [103 Cal.Rptr. 689, 500 P.2d 601] (*City of Inglewood*), citing *West* v. *Oakland* (1916) 30 Cal.App. 556, 560-561 [159 P. 202], italics omitted.) The parties have not suggested that there is any significance in the difference between the charter's phrase "lowest and best regular responsible bidder" and the above term or other similar terms.

[6] In addition to those contained in section 386(f), Domar contends that other charter exceptions to the lowest bidder requirement include: (1) when the contract involves an expenditure of less than $25,000 (§ 386(b)); (2) when the contract is for patented products (§ 386(a)(2)); (3) when a declaration of "urgent necessity" authorizing the contract is approved by the city council and the mayor (§ 386(a)(4)); (4) when, during war or national emergency, the city council by a two-thirds vote suspends all or part of the competitive bidding system (§ 386.1); (5) when the bid is not accompanied by a certified check or bid bond of 10 percent of the bid (§ 386(d)); and (6) when the bid is not accompanied by a noncollusion affidavit (*ibid.*). We conclude that these other so-called charter exceptions are irrelevant to the issue of whether the City may validly impose a particular bidding requirement not explicitly authorized by the charter. The first, second, third and fourth identified items merely represent situations or types of contracts for which competitive bidding is not required at all. The fifth and sixth items lack relevance because their purpose is to deprive the

the validity of such a requirement must be ascertained with reference to the purposes of competitive bidding, which are "to guard against favoritism, improvidence, extravagance, fraud and corruption; to prevent the waste of public funds; and to obtain the best economic result for the public" (*Graydon v. Pasadena Redevelopment Agency* (1980) 104 Cal.App.3d 631, 636 [164 Cal.Rptr. 56], citing 10 McQuillin, Municipal Corporations (3d ed.) § 29.29), and to stimulate advantageous market place competition (*Konica Business Machines U.S.A., Inc. v. Regents of University of California* (1988) 206 Cal.App.3d 449, 456 [253 Cal.Rptr. 591] [interpreting statutory competitive bid requirements]).

As one leading treatise explains: "The provisions of statutes, charters and ordinances requiring competitive bidding in the letting of municipal contracts are for the purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption, and to secure the best work or supplies at the lowest price practicable, and they are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest. These provisions are strictly construed by the courts, and will not be extended beyond their reasonable purpose. Competitive bidding provisions must be read in the light of the reason for their enactment, or they will be applied where they were not intended to operate and thus deny municipalities authority to deal with problems in a sensible, practical way." (10 McQuillin, Municipal Corporations (3d rev. ed. 1990) § 29.29, p. 375, fns. omitted.) Thus, charters requiring competitive bidding are not to be given such a construction as to defeat the object of insuring economy and excluding favoritism and corruption. (*Los Angeles Dredging Co. v. Long Beach* (1930) 210 Cal. 348, 354 [291 P. 839, 71 A.L.R. 161], citing *Harlem Gaslight Co. v. Mayor etc. of New York* (1865) 33 N.Y. 309, 329.)

■ We perceive no conflict between the outreach program and the purposes of competitive bidding. It has been generally recognized that competitive bidding requirements "necessarily imply equal opportunities to all whose interests or inclinations may impel them to compete at the bidding." (64 Am.Jur.2d (1972) Public Works and Contracts, § 37, p. 889, fn. omitted.) This is precisely what the outreach program aims to do in requiring prime contractors to provide MBE's, WBE's and OBE's an equal opportunity to compete for and participate in the performance of all city

City of any authority to contract with bidders who have not supplied the charter-mandated check, bid bond or noncollusion affidavit.

contracts. Moreover, in mandating reasonable good faith outreach to all types of subcontractor enterprises, the program in effect seeks to guard against favoritism and improvidence by prime contractors, and to increase opportunity and participation within the competitive bidding process. Consequently, not only are the program's objectives consistent with the goals of competitive bidding, but the program seeks to advance those goals by stimulating advantageous marketplace competition. In implementing its outreach program, the Board could reasonably have concluded that the program will assist the City in securing the best work at the lowest price practicable.

Domar disagrees with this assessment, arguing that the instant record contains no evidence to support the conclusion that the outreach program will actually promote competition or reduce prices. Moreover, while Domar does not assert that the outreach program increases contract prices or that it requires efforts that are unreasonable or costly,[7] Domar suggests that MBE and WBE programs generally do not lead to lower prices for public projects because they encourage bidders to use less competitive but more costly MBE and WBE firms. Domar contends that such programs do not expand the public contracts market; rather, they simply cause the market to shift from non-MBE and non-WBE firms to MBE and WBE firms and drive the former out of their existing market share.

We are not persuaded by these arguments. Despite the lack of empirical evidence, it is not unreasonable for the Board to conclude that, in the absence of mandated outreach, prime contractors will tend to seek out familiar subcontractors when bidding for projects, and that therefore their bids may or may not reflect as low a price had reasonable outreach efforts been made. Indeed, Domar is unable to cite to anything in the record that might detract from such a conclusion. Under these circumstances, the Board's action is entitled to deference. (See *Social Services Union* v. *City and County of San Francisco* (1991) 234 Cal.App.3d 1093, 1101 [285 Cal.Rptr. 905]; see also *San Mateo City School Dist.* v. *Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 856 [191 Cal.Rptr. 800, 663 P.2d 523].)

---

[7]Notwithstanding Domar's failure to make such assertions, the dissent argues that "both the good faith efforts and the documentation involve considerable time, effort, and expense, all of which represents a considerable monetary loss for the unsuccessful bidders" and which may be added to bids as part of the bidder's overhead. (Dis. opn. of Arabian, J., *post*, at p. 187.) Not surprisingly, the dissent cites no evidence in the record to support these arguments.

It is important to keep in mind that, although Domar's bid was approximately $650,000 lower than the next lowest bid, the differential was not due to the fact that Domar made no attempt to conduct the required good faith outreach, while the other bidders did. Indeed, at oral argument Domar contended that it did comply with the outreach program, but simply failed to submit the required documentation in a timely manner.

Moreover, the outreach program here poses none of the particular evils identified by Domar. The program does not require bidders to contract with any particular subcontractor enterprise, nor does it compel them to set aside any percentage of a contract award to MBE's or WBE's in order to qualify for a municipal contract. And even though the Board's outreach program provides an estimate that a participation level of 1 percent by MBE's and WBE's may be anticipated by the exercise of good faith efforts, a bidder gets no advantage or disadvantage from meeting or not meeting the specified participation level. Thus, the program provides no incentive to a bidder to use MBE's or WBE's if they are inferior in cost or ability, and the market for public contracts among subcontractors remains a level playing field.[8]

Hence, mindful as we must be of the principle that a charter must not be given such a construction as to defeat the objectives of competitive bidding (*Los Angeles Dredging Co.* v. *Long Beach, supra,* 210 Cal. at p. 354; see 10 McQuillin, *supra,* § 29.29, p. 375), we conclude that the outreach program is not void under the charter. By working to ensure that bids for municipal projects reflect the lowest prices practicable, the program is fully compatible with the charter requirement that contracts be awarded to the lowest and best regular responsible bidders.

Since the City and its agencies may validly require bidders to conduct the specified outreach without violating the charter, it follows that the Board may validly reject a bid based on the bidder's failure to demonstrate compliance with this requirement. If bidders had the option to disregard the outreach requirement because the Board was without power to enforce it, the program itself would be undermined. Moreover, even though awarding the instant contract to Bailey Controls Company may not save the City money on this particular project, the Board could reasonably have concluded that consistent enforcement of the outreach requirement will lead, in the long term, to lower contract prices. ■ Finally, the Board's action in rejecting Domar's bid due to the absence of the required good faith effort documentation is consistent with the general rule that bidding requirements must be strictly adhered to in order to avoid the potential for abuse in the competitive

---

[8]In asserting that the Board's program is invalid, the dissent at times appears to assume that the program requires bidders to achieve a minimum participation level of MBE's and WBE's and that it mandates solicitation efforts that focus exclusively on a narrow field of contractors. (See dis. opn. of Arabian, J., *post,* at pp. 181, fn. 1, 184-186.) However, as the record makes clear, the program has a broad focus, requiring outreach to all types of subcontracting enterprises—MBE's, WBE's *and OBE's.*

bidding process.[9] (*Konica Business Machines U.S.A., Inc.* v. *Regents of University of California, supra,* 206 Cal.App.3d at p. 456 [strict adherence with bidding requirements is applied "even where it is certain there was in fact no corruption or adverse effect upon the bidding process, and the deviations would save the [public] entity money"].)

(7) Contrary to Domar's assertions, the charter's enumeration of various exceptions to the lowest and best regular responsible bidder restriction in section 386(f) does not compel a different result. Unlike the outreach program, virtually all of the exceptions listed in section 386(f) tend to be anticompetitive in nature.[10] For instance, antiapartheid restrictions suppress competition by disqualifying potential contractors on the basis of their connections with South Africa without regard to their potential for offering the lowest price practicable. Similarly, local bidder preferences generally inhibit competition in that they prohibit potential contractors from competing on an equal basis. Finally, domestic content requirements discriminate against the use of foreign products and may thereby substantially increase the cost of a project, thus undermining the goal of securing the best bargain for the public. That the charter expressly authorizes the City and its contracting agencies to consider these anticompetitive factors during the bid process (pursuant to lawfully enacted ordinances) does not logically lead to the conclusion that bid requirements intended to stimulate and promote competition may not be considered.

Additionally, Domar's reliance on *Associated General Contractors of California, Inc.* v. *City and County of San Francisco* (9th Cir. 1987) 813 F.2d 922 (*Associated General Contractors*) and *Neal Publishing Co.* v. *Rolph* (1915) 169 Cal. 190 [146 P. 659] is misplaced. Those cases are factually distinguishable and do not support Domar's position.

*Associated General Contractors, supra,* 813 F.2d 922, dealt with an ordinance of the City and County of San Francisco that: (1) required each city department to set aside 10 percent of its purchasing dollars for MBE's and 2 percent for WBE's; (2) gave a 5 percent bidding preference to MBE's, WBE's and locally owned business enterprises (LBE's); (3) required each city department to establish a yearly goal for the percentage of contracting dollars to go to MBE's, WBE's and LBE's and required prospective prime

[9]Domar makes no contention that it was not afforded due process on the matter of its late submission of documentation. (See *Taylor Bus Service, Inc.* v. *San Diego Bd. of Education* (1987) 195 Cal.App.3d 1331, 1343 [241 Cal.Rptr. 379].) Consequently, it is not an issue in the case.

[10]The sole exception is the provision that allows rejection of a bidder previously delinquent or unfaithful in the performance of any former contract.

contractors to submit bids that met or exceeded such goals; and (4) established as an overall goal that 30 percent of the city's contracting dollars shall go to MBE's and 10 percent to WBE's. (813 F.2d at p. 924.) In that case, the Ninth Circuit concluded that the ordinance violated a city charter provision requiring that all contracts worth more than $50,000 be awarded to the "lowest reliable and responsible bidder." (*Id.*, at pp. 924-928.)

Even if the competitive bidding scheme contained in the San Francisco charter is the same or similar to the one here, there are significant differences between the set-asides, bid preferences and contracting goals enacted in San Francisco and the good faith outreach required here. ■ As the United States Court of Appeals for the Ninth Circuit recognized, perhaps the most important goal of competitive bidding is to protect against "insufficient competition to assure that the government gets the most work for the least money." (*Associated General Contractors, supra,* 813 F.2d at p. 926.) Mandatory set-asides and bid preferences work against this goal by narrowing the range of acceptable bidders solely on the basis of their particular class. In stark contrast, requiring prime contractors to reach out to all types of subcontracting enterprises broadens the pool of participants in the bid process, thereby guarding against the possibility of insufficient competition. In light of these differences, *Associated General Contractors, supra,* 813 F.2d 922, does not persuade us to find the outreach program violative of the City's charter.[11]

*Neal Publishing Co.* v. *Rolph, supra,* 169 Cal. 190, is likewise unhelpful to Domar. That case involved a contract for the furnishing of printed forms which the mayor refused to sign after the board of supervisors had awarded the contract to the plaintiff as the successful bidder. The mayor contended, inter alia, that awarding the contract to the plaintiff would have violated a board resolution requiring that all printing jobs be awarded to unionized printers. (169 Cal. at p. 196.) The mayor's arguments did not prevail. After noting that the resolution preceded the enactment of charter provisions requiring competitive bidding, this court held that the resolution was merely directive in nature and that it was not binding on the board itself in awarding contacts. (*Id.*, at pp. 196-197.) Although there is language in the case to the effect that, in any event, the board of supervisors could not impose additional conditions to those imposed by the charter for competitive bidding without violating the provision requiring contracts to be awarded to the lowest bidder (*id.*, at p. 197), such dicta must be understood in light of the

---

[11]Of course, if a bidder were to demonstrate that the Board in fact considered MBE or WBE participation levels in awarding a bid, the legal reasoning of *Associated General Contractors, supra,* 813 F.2d 922, might have more force.

union requirement claimed there. That requirement was clearly anticompetitive in that contractors were rendered ineligible for a bid award based solely on their nonunion status. The case does not aid Domar under the instant facts.

Finally, the parties and various amici curiae dispute whether our decision in *City of Inglewood, supra,* 7 Cal.3d 861, supports Domar's position. In that case, a civic center authority awarded a contract to a contractor who was not the lowest monetary bidder, even though former Government Code section 25454 (now Pub. Contract Code, § 20128) required that contracts be awarded to the "lowest responsible bidder." The authority had based the award, not on a finding that the lowest bidder was not responsible, but on a determination that the higher bidder was relatively superior in ability to perform the work. In ruling to set aside the award, we reasoned that the statute provided no basis for applying a relative superiority concept. (7 Cal.3d at p. 867.) Rather, it required the authority to award the contract to the lowest bidder unless the bidder was found not responsible, i.e., not qualified to do the particular work under consideration. (*Ibid.*)

Although our decision in *City of Inglewood, supra,* 7 Cal.3d 861, makes clear that a competitive bidding scheme with a lowest responsible bidder restriction ordinarily requires a contract to be awarded to the bidder who submits the lowest monetary bid and is responsible, the case does not concern the issue presented here, i.e., whether a public entity may, consistently with its charter, impose certain requirements upon bidders as part of the bid specifications for a project. Unlike the instant case, *City of Inglewood, supra,* did not involve a challenge to the validity of a particular bid requirement, nor did it concern a situation where the lowest monetary bidder had failed to comply with all advertised bid requirements.[12]

Accordingly, we hold that the Board's outreach program does not violate the competitive bidding provisions set forth in the City's charter.[13]

---

[12]Consistent with the holding of *City of Inglewood, supra,* 7 Cal.3d 861, the City concedes that the lowest responsible monetary bidder that meets the Board's minimum standards for demonstrating good faith outreach efforts must be awarded a bid over the next lowest responsible monetary bidder that exceeds the minimum standards.

[13]In its answer brief on the merits, Domar argues that the outreach program is void for the additional reason that the mayor of the City acted in excess of his mayoral authority under the charter in issuing Executive Directive Nos. 1-B and 1-C. We need not consider this argument since it was not raised below. In any event, the point is not well taken. As the relevant charter provisions make clear, the Board "shall have and exercise all the powers and duties possessed by the City under this Charter . . . relating to: [¶] (a) The advertising for and inviting of proposals or bids for doing any work or making any improvement . . . ; [¶] (b) The

## III. Disposition

The judgment of the Court of Appeal is reversed and the matter is remanded to allow that court to address whether Domar may otherwise be entitled to relief based on the alternative grounds identified in its notice of appeal.

Lucas, C. J., Mosk, J., Kennard, J., George, J. and Werdegar, J., concurred.

ARABIAN, J.—I respectfully dissent. Accepting the proposition that a home rule charter city has broad powers to conduct its municipal affairs free of outside interference, city agencies nonetheless are without authority to act in any manner that conflicts with express charter provisions. While I certainly have no quarrel with the laudatory and undoubtedly long overdue goals of the minority- and women-owned business enterprise outreach program, the unvarnished fact is that it is intended to promote social policy, not competition. More importantly and to the point, conditioning acceptance of otherwise qualified prime contractor bids on documentation of good faith outreach efforts is incompatible with the mandate of Los Angeles City Charter section 386(f) that contracts for city work "shall be let to the lowest and best regular responsible bidder." Neither the record before this court nor intuitive logic supports the majority's conclusion that the outreach program is necessary to or does in fact "eliminate favoritism, fraud and corruption; avoid misuse of public funds; [or] stimulate advantageous market place competition." (*Konica Business Machines U.S.A., Inc.* v. *Regents of University of California* (1988) 206 Cal.App.3d 449, 456 [253 Cal.Rptr. 591].) Indeed, as this case empirically documents, it runs directly counter to the purpose and goals of the competitive bidding process.

Notwithstanding the breadth of its plenary powers, the City of Los Angeles through its various agencies is restricted in the exercise of municipal authority by any and all express limitations contained in the city charter. (*City of Grass Valley* v. *Walkinshaw* (1949) 34 Cal.2d 595, 599 [212 P.2d 894].) A necessary corollary to this principle is that " 'an ordinance [or executive equivalent] must conform to, be subordinate to, not conflict with, and not exceed the [city's] charter, and can no more change or limit the

---

examining, considering and preparing of such proposals or bids; [¶] (c) The awarding, letting, reletting, entering into and signing of contracts on behalf of the City for doing any said work or making of any said improvements . . . ." (§ 233.) Thus, even though the outreach program at issue was adopted by the Board in response to the mayor's directives, the validity of the program does not depend on whether the charter allows the mayor to issue directives of the sort involved here.

effect of the charter than a legislative act can modify or supersede a provision of the constitution of the state.' [Citations.]" (*Currieri* v. *City of Roseville* (1970) 4 Cal.App.3d 997, 1001 [84 Cal.Rptr. 615], quoting 5 McQuillin, Municipal Corporations (3d ed. 1969 rev.) Nature, Requisites and Operation of Municipal Ordinances, § 15.19, pp. 79-80.)

Subject only to enumerated exceptions, Los Angeles City Charter section 386(f) requires that contracts "shall be let to the lowest and best regular responsible bidder furnishing satisfactory security for its performance" and thus constitutes an specific and categorical restriction on the city's contracting authority. (See *Associated General Contractors of California* v. *City and County of San Francisco* (9th Cir. 1987) 813 F.2d 922, 927; see also *Los Angeles Dredging Co.* v. *Long Beach* (1930) 210 Cal. 348, 353 [291 P. 839, 71 A.L.R. 161] ["the mode of contracting, as prescribed by the municipal charter, is the measure of the power to contract; and a contract made in disregard of the prescribed mode is unenforceable"].) In this context, "California courts have uniformly construed the term 'low responsible bidder' [and its variants] to mean the bidder who can be expected to successfully complete the contract for the lowest price." (*Associated General Contractors of California* v. *City and County of San Francisco, supra,* 813 F.2d at p. 926, fn. omitted.) The concept is not one of relative superiority but "has reference to the quality, fitness and capacity of the low bidder to satisfactorily perform the proposed work. [Citation.] Thus, a contract must be awarded to the lowest bidder unless it is found that he is not responsible, i.e., not qualified to do the particular work under consideration." (*City of Inglewood-L.A. County Civic Center Auth.* v. *Superior Court* (1972) 7 Cal.3d 861, 867 [103 Cal.Rptr. 689, 500 P.2d 601]; *West* v. *Oakland* (1916) 30 Cal.App. 556, 560-561 [159 P. 202].)

Any deviation from acceptance of the lowest and most capable bidder operates in derogation of the charter mandate and is therefore void. (*San Francisco Fire Fighters* v. *City and County of San Francisco* (1977) 68 Cal.App.3d 896, 902-903 [137 Cal.Rptr. 607].) It follows that additional qualifications to the competitive bidding process not contained in the charter itself must relate directly to a bidder's "experience and financial and material resources necessary to" perform the contract. (*Steelgard, Inc.* v. *Jannsen* (1985) 171 Cal.App.3d 79, 93 [217 Cal.Rptr. 152].) Thus, while a bid must be "responsive," i.e., comply with any specifications contained in the call for

bids, those specifications must be relevant to a determination of whether the bidder is "responsible."[1]

The majority attempts to bring the requirement of documenting compliance with the minority- and women-owned business enterprise (M/WBE) outreach program within the foregoing framework by finding that it enhances competition and promotes the goals of public sector competitive bidding; therefore, it does not conflict with the charter's "lowest and best regular responsible bidder" mandate. After careful consideration of the analysis, I am unpersuaded outreach compliance was intended to or does accomplish this purpose. The majority's rationalization is essentially created out of whole cloth. In point of fact, with its extensive good faith effort and documentation requirements, the program potentially narrows the field of qualified bidders, undermines meaningful competition, and can only lead to the city's fiscal detriment by contributing to higher contractual costs.

Most critically, the majority conspicuously fails to identify *any* relationship between documentation of good faith outreach efforts and the question of whether a prime contractor has "the quality, fitness and capacity . . . to satisfactorily perform the proposed work." (*City of Inglewood-L.A. County Civic Center Auth.* v. *Superior Court, supra,* 7 Cal.3d at p. 867.) Nor would such a demonstration be possible since documentation compliance concerns only whether a bidder is "responsive," not whether it is "responsible." (See *Am. Combustion* v. *Minority Business Opportunity* (D.C.App. 1982) 441 A.2d 660, 671; *Gilbert Cent. Corp.* v. *Kemp* (D.Kan. 1986) 637 F.Supp. 843, 848-849; see also, *ante,* fn. 1.) Thus, as a threshold proposition, if the outreach requirement operates to eliminate, as it did here, capable lowest bidders, it conflicts with the charter mandate whether or not it enhances competitiveness.

---

[1] For example, the "General Instructions and Information for Bidders" on the Hyperion project contained numerous specifications in addition to the outreach program. With limited exceptions, they all related to the bidder's qualifications to do the work in a competent and financially sound manner without risk to the city, including bonding and insurance, construction schedules, and liquidated damages. (See also L.A. City Charter, § 386(c) & (d).) Other than the outreach program, the only exceptions were matters governed by superseding state and federal law, such as prevailing wage, apprenticeship utilization, and nondiscrimination obligations. The materials also contain information regarding the city's employment and training policy, which requires bidders to submit a declaration of compliance. This program appears to be an effort to facilitate job placement of disadvantaged youth and adults residing in the city. The only obligation on the part of a bidder is to identify potential openings for these individuals and consider them for employment to the extent they are qualified. Unlike the outreach program, no minimum participation level is set, no outreach is mandated, and no further documentation is required. Accordingly, it does not appear inconsistent with the charter's "lowest and best" limitation.

Moreover, the "long and well-established rule" is that the public bidding process "must be free of any restrictions tending to stifle competition. [Citations.]" (*Baldwin-Lima-Hamilton Corp.* v. *Superior Court* (1962) 208 Cal.App.2d 803, 821 [25 Cal.Rptr. 798].) To the extent a mandatory good faith outreach effort, including the extensive documentation requirements, tends to discourage or disqualify prime bidders otherwise "qualified to do the particular work under consideration" (*City of Inglewood-L.A. County Civic Center Auth.* v. *Superior Court, supra,* 7 Cal.3d at p. 867), it narrows the field of acceptable proposals rather than expands it, thus "defeating the real objectives of competitive bidding." (*Baldwin-Lima-Hamilton Corp.* v. *Superior Court, supra,* 208 Cal.App.2d at p. 822; *Konica Business Machines U.S.A., Inc.* v. *Regents of University of California, supra,* 206 Cal.App.3d at p. 456.) This case plainly proves the point: Domar Electric, Inc., was prequalified by the city to bid on the Hyperion project and apparently at all times has been considered "responsible" as mandated by the charter. Of note to the taxpayers, it submitted the lowest bid, which was rejected solely for failure to timely document good faith outreach efforts. (Cf. *R & A Vending Services, Inc.* v. *City of Los Angeles* (1985) 172 Cal.App.3d 1188, 1193 [218 Cal.Rptr. 667] [Lowest bidder's proposal " 'was unrealistic and contained admitted inaccuracies.' "].) In my view, this anticompetitive result provides a strong indication the city has run afoul of the charter's express limitation on the letting of city contracts.

The outreach program is suspect in many other respects as well. To begin with, nothing in the record suggests any aspect of the program, including documentation of good faith efforts, was intended to spur competition in the bidding on city contracts.[2] Neither of the mayor's executive directives (Nos. 1-B and 1-C) identifies any perceived deficiency in the level of competition for public works or other city business. In fact, the tenor of both indicates the outreach program was formulated solely as an affirmative action measure to generate wider involvement of M/WBE's in city projects. The original directive announced that the city's policy was "to utilize [M/WBE's] in all aspects of contracting relating to procurement, construction, and personal services" and was "fully committed to substantially increase[d] [M/WBE] utilization and participation in all phases of the City's . . . contracting,"

---

[2]The majority claims that the outreach program has the effect of "stimulating advantageous market place competition" and hypothesizes that therefore "the Board [of Public Works] could reasonably have concluded that the program will assist the City in securing the best work at the lowest price practicable." (Maj. opn., *ante,* at p. 174.) In fact, the record contains no evidence that the board incorporated the outreach program into its bid specifications for reasons independent of the mayor's directives or that it did so for any purpose other than implementation of the city policy as set forth in those documents, which contain no reference to enhancement of competition.

with no reference to improving the broader competitive bidding process. In addition, the city's "Affirmative Action Officers," among others, were directed to assist in "developing, managing, and implementing" the policy and program; the 5 percent preference allowed under the city's Small Local Business Program was to be used "to the maximum extent possible" to involve M/WBE's; and city departments were to report monthly the extent of implementation including "dollar amounts of contracts awarded" M/WBE's.[3]

Most tellingly, in direct response to the decision by the United States Supreme Court in *Richmond* v. *J. A. Croson* (1989) 488 U.S. 469 [102 L.Ed.2d 854, 109 S.Ct. 706], invalidating a race- and gender-conscious set-aside program on equal protection grounds, the mayor "clarified" his original directive to explain that a bidder's "failure to meet [the expected levels of M/WBE participation set by the awarding authority] shall not itself be the basis for disqualification of the bidder . . . ." The city also commissioned a study, consistent with the dictates of *Croson*, to determine the incidence, if any, of intentional discrimination against M/WBE's in city contracting. (See generally, *id.*, at pp. 498-506 [102 L.Ed.2d at pp. 884-890]; see also *Concrete Works of Colorado, Inc.* v. *City & County of Denver* (10th Cir. 1994) 36 F.3d 1513, 1523-1530.) At the same time, the new directive reiterated the earlier policy statements and directed city agencies to continue to condition acceptance of bid proposals from otherwise qualified contractors on documentation of good faith outreach efforts measured by nine specific criteria. This obvious concern that the outreach program not fall prey to an equal protection challenge, coupled with efforts to satisfy the constitutional restrictions imposed on race- and gender-conscious public contracting practices under *Croson*, places an unmistakable social policy stamp on the program, unrelated to any articulated need or intent to enhance competitive bidding for the general benefit of the city. (See generally, *Concrete Works of Colorado, Inc.* v. *City & County of Denver*, *supra*, 36 F.3d at pp. 1520-1522.)

Moreover, the city has essentially admitted its social policy agenda. At this point, an awarding agency's only concern in determining a bidder's responsiveness is *documentation* of good faith outreach efforts; actually securing M/WBE participation is irrelevant if not accompanied by the appropriate paperwork. For example, in this case although Domar has qualified with the California Department of Transportation as a WBE, the city

---

[3]Information supplied to bidders in this case similarly states: "It is the policy of the City of Los Angeles to provide [M/WBE's] an equal opportunity to participate in the performance of all City contracts. Bidders shall assist the City in implementing this policy by taking all reasonable steps to ensure that any qualified available business enterprise including [M/WBE's] have an equal opportunity to compete for and participate in City contracts."

rejected its low bid for failure to timely provide M/WBE outreach documentation. As explained in *Associated General Contractors of California* v. *City and County of San Francisco, supra,* interjecting considerations into the bidding process that do not implicate a contractor's qualifications to do the work in question is contrary to "the charter's mandate that contracts be awarded to the lowest bidder." (813 F.2d at p. 926, fn. omitted; cf. *Konica Business Machines U.S.A., Inc.* v. *Regents of University of California, supra,* 206 Cal.App.3d at p. 456; *Baldwin-Lima-Hamilton Corp.* v. *Superior Court, supra,* 208 Cal.App.2d at p. 822.)

Notwithstanding the indisputable evidence the city instituted the outreach program for reasons wholly extrinsic to the "lowest and best regular responsible bidder" injunction and its underlying goals and purpose, the majority finds the good faith documentation requirement valid because it promotes market competition. Implicitly, this inaccurate predicate rests on the unexamined, and on this record unsubstantiated, premise that the city could have reasonably determined "more is better," i.e., that increasing the number of subcontractors considered by each prime in submitting its final bid will produce the most economical, highest quality results for the city. For the reasons that follow, I find no empirical or intuitive support for this assumption.

First, nothing in the record suggests the city had any concern that its standard bidding procedures were not adequately serving their intended purpose: "to protect against a variety of ills that might befall the government procurement process: sloth, lack of imagination or carelessness on the part of those who award public contracts; inadequate notice to potential bidders; causing contracting officers to act on the basis of ignorance or misinformation; and, perhaps most important of all, insufficient competition to assure that the government gets the most work for the least money. [Citation.]" (*Associated General Contractors of California* v. *City and County of San Francisco, supra,* 813 F.2d at p. 926.) If the city had in fact identified some inadequacy, an elaborate outreach program replete with documentation requirements seems an ill-suited remedy. The logical expedient would be to set a minimum number of subcontractor bids for designated portions of the work on any given project. (See, *post,* fn. 4.) Moreover, even though prime contractors are not limited to considering M/WBE's, mandating solicitation efforts that tend to focus exclusively on a narrow field of subcontractors cannot reasonably enhance competition and may well have the opposite

effect.[4] (Cf. *Baldwin-Lima-Hamilton Corp.* v. *Superior Court, supra,* 208 Cal.App.2d at p. 822.)

The record is equally devoid of any evidence from which rationally to conclude that implementing the M/WBE outreach program as presently formulated would as a practical matter enhance competition.[5] Several factors warrant a contrary conclusion. Looking at the structure of the program itself, the authorizing agency is to evaluate good faith efforts by determining if the bidder's efforts "could be expected . . . to produce" a specified level of M/WBE participation; the level is set by the agency and varies from contract to contract. Here, the Los Angeles Board of Public Works set the level of M/WBE participation on the Hyperion project at *1 percent.* Even assuming the outreach program would in some manner augment competitiveness, such an insignificant proportion of activity could have no more than negligible impact on the prime contractor's ultimate bid.[6] In other words, any financial advantage to the city was likely to be nil.

In reality, however, the consequence was even worse: *In this case alone,* the "benefit" of "stimulating" market competition by mandating documentation of good faith outreach efforts was an increased cost to the city and its taxpayers of more than $650,000, the amount by which Bailey Controls Company's bid exceeded Domar's. The majority's attempt to justify this departure from the charter mandate on the somewhat blithe as well as unsustainable supposition that "consistent enforcement of the outreach requirement will lead, in the long term, to lower contract prices" (maj. opn., *ante,* at p. 175) is legally and factually untenable, and reflects quintessential

---

[4]The majority notes that the mayor's second directive expanded the outreach program to include "other business enterprises," (OBE'S), i.e., non-M/WBE's. (Maj. opn., *ante,* at p. 175, fn. 8.) This addition appears as much an effort to distract from the program's potential constitutional weakness following *Croson* as an attempt further to enhance competitiveness. At least with respect to this particular case, the practical effect of including "other business enterprises" appears negligible since the bid material provided by the Los Angeles Board of Public Works still continued to emphasize M/WBE's, in particular in setting the expected level of participation. Moreover, if the city actually sought to increase competition among subcontractors rather than promote social policy, simply requiring a minimum number of sub-bids would accomplish that purpose without the compulsion of specific mandatory outreach efforts that can only encumber the process and add to the prime contractor's overall expense.

[5]Since the city is still awaiting the results of its commissioned study on the extent, if any, of discrimination against M/WBE's in public contracting, there is no support for another key assumption of the majority's analysis: that these enterprises are not presently participating in the bidding process in adequate numbers. Moreover, even if they had been excluded, the record contains no evidence such exclusion has actually impaired the competitive process or resulted in inflated contractual prices for the city.

[6]To put these numbers in concrete terms, 1 percent of Domar's bid was $33,000.

"pie in the sky" thinking. The record contains no evidence that "over time" M/WBE subcontractors can or will provide less costly goods and services of acceptable quality. More importantly, Los Angeles City Charter section 386(f) commands that the city and its agencies award *each and every contract* to the lowest responsible bidder. This language is clear, precise, and unequivocal. It does not accommodate the kind of "averaging" the majority's analysis superimposes. Any touted competitive value attributable to the outreach program is strictly hypothetical; and documentation compliance in fact reduces competition in direct conflict with the charter's mandate. As this court agreed more than 20 years ago, " 'To permit a local public works contracting agency to expressly or impliedly reject the bid of a qualified and responsible lowest monetary bidder in favor of a higher bidder deemed to be more qualified frustrates the very purpose of competitive bidding laws and violates the interest of the public in having public works projects awarded without favoritism, without excessive cost, and constructed at the lowest price consistent with the reasonable quality and expectation of completion.' " (*City of Inglewood-L.A. County Civic Center Auth.* v. *Superior Court, supra,* 7 Cal.3d at p. 867.)

In addition, the process by which city agencies determine good faith outreach efforts invites the very subjectivity, arbitrariness, and cronyism that competitive bidding is intended to eliminate. (Cf. *Konica Business Machines U.S.A., Inc.* v. *Regents of University of California, supra,* 206 Cal.App.3d at p. 457.) Here, the Los Angeles Board of Public Works informed each prequalified bidder that it required a "positive and adequate demonstration to the satisfaction of the Board" of good faith efforts according to 10 enumerated criteria. The only measure of this "positive and adequate demonstration" was the board's apparently ad hoc assessment of whether the bidder's outreach effort was sufficient "to obtain [M/WBE] sub-bid participation . . . which can be expected by the Board of Public Works to produce a [1 percent] level of participation by interested businesses . . . ." While each criterion was assigned a specific number of possible points totaling a maximum of 100, the record reveals no rational basis on which the assignments were made. Moreover, many criteria are themselves less than precise. For example, a bidder must have "negotiated in good faith with interested [M/W/OBE's] and . . . not unjustifiably reject[ed] as unsatisfactory the sub-bids prepared by any enterprise"; but none of these provisions is quantified or defined in objective terms. Taken in conjunction with the vague standard by which the overall good faith effort was evaluated, the entire process was rife with the potential for abuse to the detriment of the competitive bidding process, thereby heightening public suspicion of city affairs. (See *Ertle* v. *Leary* (1896) 114 Cal. 238, 241-242 [46 P. 1].)

The majority's conclusion that documentation of good faith outreach efforts is consistent with the goals of competitive bidding also ignores some critical economic realities. First, any increase in the bureaucracy associated with submitting bids on city contracts will inevitably increase their cost. (Cf. 44 U.S.C. § 3501 et seq. [citing in part minimizing burden on small businesses and cost as purpose of federal Paperwork Reduction Act].) By their nature, both the good faith efforts and the documentation involve considerable time, effort, and expense, all of which represents a considerable monetary loss for the unsuccessful bidders. (Cf. *Gilbert Cent. Corp.* v. *Kemp*, *supra*, 637 F.Supp. at p. 850 [14 letters and 5 telephone calls with generic information about city project held insufficient to demonstrate "good faith effort"].) So much for the encouragement of a healthy business climate. Furthermore, those prime contractors not inhibited by this possibility may recoup some or all of the additional overhead expense by increasing their bids, which the city will eventually have to absorb when it awards the final contract.

Satisfying some outreach criteria also tends to discourage cost-effective practices by prime contractors. For example, to demonstrate good faith compliance, a bidder must "subdivide the total contract work requirements into smaller portions or quantities to permit maximum active participation of [M/W/OBE's]." Such subdivision is likely to preclude a prime contractor from taking advantage of economies of scale offered by larger suppliers, relying on its own in-house facilities at a lower cost, or otherwise benefiting from the ability to maintain a consolidated operation. Moreover, a prime contractor must have confidence that any subcontractors it considers possess the technical acumen, efficiency, and financial stability to perform the project in a competent and timely manner, just as the city itself did in this case when it prequalified the bidders. As with documentation, substantiating a subcontractor's qualifications takes time, effort, and expense.[7] Whether or not this requirement promotes competition, it is unlikely to reduce the overall price the city pays for goods and services.

## CONCLUSION

While generally courts will not consider the motive of legislative or executive officers in construing their actions (see, e.g., *County of Los Angeles* v. *Superior Court* (1975) 13 Cal.3d 721, 726-727 [119 Cal.Rptr.

---

[7]Since a bidder is subject to disqualification for having been "previously delinquent or unfaithful in the performance of any former contract with the City" (L.A. City Charter, § 386(f)), which would include any subcontractor deficiencies, prime contractors cannot take this task too lightly.

631, 532 P.2d 495]), on occasion the underlying purpose or goal may be highly relevant to determining the intent of a particular enactment and thus a proper subject for assessing its validity. (Cf. *Village of Arlington Heights* v. *Metropolitan Housing Corp.* (1977) 429 U.S. 252, 265-266 50 L.Ed.2d 450, 464-465, 97 S.Ct. 555] [recognizing relevance of discriminatory purpose in assessing validity of rezoning decision].) The express terms of the mayor's executive directives make it indisputably clear that the City of Los Angeles promulgated the M/WBE outreach program in an effort to remedy perceived discrimination against these enterprises in city contracting, not to enhance the competitive bidding process. While the city is generally at liberty to enact whatever measures it finds appropriate to implement social policy, it is nevertheless bound to do so within the express limitations of its own governing charter. In this case, the requirement that prime contractors bidding on city projects document good faith M/WBE outreach efforts narrows rather than expands the field of bidders capable of performing the work in question, thereby stifling, not increasing, competition. It thus plainly contravenes the mandate that contracts "*shall be let to the lowest and best regular responsible bidder.*" (L.A. City Charter, § 386(f), italics added.)

For the reasons stated, I would affirm the judgment of the Court of Appeal.

Appellant's petition for a rehearing was denied February 23, 1995. Arabian, J., was of the opinion that the petition should be granted.