GEORGE, C. J., Concurring and Dissenting.—
I agree with all of my colleagues that the particular features of the affirmative action program that are challenged in this case violate article I, section 31, of the California Constitution—the section added to the California Constitution in 1996 by the voters’ passage of Proposition 209—because these features grant “preferential treatment” to individuals or groups on the basis of race or gender as proscribed by this newly added constitutional provision.[1]
I cannot join the majority opinion, however, because in my view the major portion of that opinion’s discussion is not only unnecessary to the resolution of the issue before us, but is likely to be viewed as less than evenhanded. Particularly in a case involving an initiative measure that is as sensitive and potentially divisive as Proposition 209, I believe it is essential that this court speak through an opinion whose language and analysis clearly demonstrate to the parties and to the public that the court appreciates that its task is simply to interpret and apply the initiative’s language so as to effectuate the electorate’s intent. Viewing the majority opinion as a whole, I believe it falls short of this standard.
I
There can be no dispute that discrimination on the basis of race, gender, color, ethnicity, and national origin has played a pernicious role in the history of both our nation and our state. This historical discrimination has left our society with a woeful legacy that has proven difficult to overcome. Persons of goodwill hold widely differing, and very strongly felt, views regarding both the morality and the efficacy of utilizing race- or gender-conscious policies or programs as remedial tools to combat the lingering *577 effects of past discrimination and to attempt to avoid the perpetuation of such discrimination in the present and into the future.
In resolving the issue presented in the case now before us, there is no reason for this court to revisit and reassess past judicial decisions, rendered prior to the passage of Proposition 209, that considered the general validity of utilizing race- or gender-conscious measures as part of an affirmative action program, or to engage in an extended inquiry into whether such measures are or are not consistent with our nation’s and our state’s constitutional tradition. Our role, rather, is simply to interpret and apply the language of the new state constitutional provision so as to effectuate the intent of the voters who adopted the measure. In my view, the majority opinion departs from that role in a number of respects.
First, a substantial portion of the majority opinion is devoted to a lengthy discussion of past decisions of the United States Supreme Court and this court that involve either racially discriminatory practices that unquestionably had no remedial purpose or effect, or affirmative action programs that predate the passage of Proposition 209. (See maj. opn., ante, at pp. 554-558.) The majority opinion’s lengthy discussion of these cases culminates in a general critique of a number of past decisions of the United States Supreme Court and of this court that have concluded that (in some circumstances) neither the federal nor the state equal protection clause, nor title VII of the federal Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) (hereafter Title VII) or its California counterpart, precludes Congress, a state, or private parties from voluntarily adopting an affirmative action program that, for remedial purposes, explicitly takes race or gender into account. (See, e.g., University of California Regents v. Bakke (1978) 438 U.S. 265 [98 S.Ct. 2733, 57 L.Ed.2d 750]; Steelworkers v. Weber (1979) 443 U.S. 193 [99 S.Ct. 2721, 61 L.Ed.2d 480]; Johnson v. Transportation Agency (1987) 480 U.S. 616 [107 S.Ct. 1442, 94 L.Ed.2d 615]; Price v. Civil Service Com. (1980) 26 Cal.3d 257 [161 Cal.Rptr. 475, 604 P.2d 1365].) The overall tenor of the majority opinion’s discussion of these decisions—including its repeated and favorable quotation from dissenting opinions in these cases and from academic commentators critical of these decisions—leaves little doubt that the majority opinion embraces the view that the types of affirmative action programs at issue in these past decisions always have violated the provisions of the federal and state equal protection clauses and Title VII, and that the numerous decisions of the United States Supreme Court and this court that reached a contrary conclusion were wrongly decided.
The issue before us in this case, however, is not the validity of past decisions interpreting or applying other constitutional or statutory provisions—such as the federal or state equal protection clauses or Title VII—but *578 rather the proper interpretation and application of article I, section 31, the provision added to the California Constitution by Proposition 209 (hereafter article I, section 31). This newly added constitutional provision is by its terms limited specifically to governmental actions “in the operation of public employment, public education, or public contracting,” and does not purport to affect constitutional or statutory doctrine outside this specified realm. In view of the limited issue before us, it is unnecessary and inappropriate to use this case as an occasion in which to attack the analysis and conclusions of pre-Proposition 209 decisions of either the United States Supreme Court or this court construing other constitutional or statutory provisions, and thereby to throw into doubt the continued applicability of those decisions outside the realm addressed by article I, section 31. The devotion of so much of the majority opinion’s discussion to criticism of the currently prevailing interpretation of both Title VII and the equal protection clause, can serve only to undermine confidence in the opinion’s analysis of the legal question actually presented by this case, i.e., the proper interpretation and application of article I, section 31.
Second, by using misleading and unflattering slogans to characterize past judicial decisions upholding race-conscious and gender-conscious affirmative action programs—describing such decisions as “replac[ing] individual right of equal opportunity with proportional group representation” (maj. opn., ante, at p. 555, italics added) and as endorsing a change “from protection of equal opportunity for all individuals to entitlement based on group representation” (ibid., italics added)—the majority opinion, in my view, will be widely and correctly viewed as presenting an unfair and inaccurate caricature of the objective or justification of the overwhelming majority of race- or gender-conscious affirmative action programs. Nowhere does the majority opinion consider alternative rationales for affirmative action programs—grounds that cannot be as easily disparaged when not saddled by the catchphrases (“proportional group representation,” “entitlements based on group representation”) employed by the majority opinion.
The terminology employed by the majority opinion ignores the circumstance that, in many instances, race or gender has been utilized as a “plus” factor in the affirmative action setting—not because of any belief in group entitlement or proportional representation, but rather to obtain the benefits that are anticipated to flow from the inclusion of one or more persons from groups that are not currently represented in a given entity or organization. For example, at a time when no woman or member of a racial minority ever had served on the United States Supreme Court, if a President, in choosing among equally qualified candidates for a seat on the court, were to have *579 taken into consideration a candidate’s race or gender as a factor in the decision whom to appoint, the use of race or gender could not accurately be characterized as based on group entitlement or proportional representation, but rather likely would rest on the belief that such a characteristic of the candidate would bring something worthwhile to the court as a whole, both in terms of the public’s relative confidence in the institution and because members of such previously unrepresented groups might add something distinctive and valuable to the court’s deliberations and decisionmaking. Similarly, when a college or university whose student body has been and continues to be almost all White voluntarily decides to institute an affirmative action policy under which qualified minority applicants are given special consideration, the justification for the policy may not be based upon any notion of “entitlement based on group representation” or “proportional group representation,” but instead may well stem from a genuine belief on the part of the institution that an integrated student body will provide a better education for all students attending the school. And a comparable justification may underlie many of the affirmative action programs voluntarily instituted in recent years by those large corporations that have concluded that an integrated work force (including management) enables the organization to better serve its diverse clientele.
Another common justification for the adoption of an affirmative action program is that it may serve as a means of taking into account or remedying the continuing effects of past discrimination. For example, with regard to a job category (such as the construction trades) from which women traditionally have been excluded, an employer might conclude that when two applicants (one a man, one a woman) perform equally well on a qualifying test, the woman’s performance actually might demonstrate that she has greater potential because she has managed to attain her current skill level despite the lack of general societal or cultural support for such an endeavor. Again, the use of gender-conscious affirmative action in this manner does not necessarily reflect a belief in group entitlement or proportional representation, but rather a more benign justification.
Of course, the circumstance that the objective or justification for a race- or gender-conscious affirmative action program is not group entitlement or proportional representation but some other, more defensible, purpose does not necessarily mean that the program is constitutional, either under pre-Proposition 209 or post-Proposition 209 principles. But the majority opinion’s characterization of past judicial decisions upholding race- or gender-conscious affirmative action as based in general upon a view that emphasizes group entitlement or proportional representation is not an objective description, and the opinion’s resort to these highly charged slogans undermines the credibility of its ruling.
*580 Finally, in my view, the general theme that runs throughout the majority opinion’s historical discussion—that there is no meaningful distinction between discriminatory racial policies that were imposed for the clear purpose of establishing and preserving racial segregation, on the one hand, and race-conscious affirmative action programs whose aim is to break down or eliminate the continuing effects of such segregation and discrimination, on the other—represents a serious distortion of history and does a grave disservice to the sincerely held views of a significant segment of our populace. As is demonstrated by the numerous and lengthy past judicial decisions that have considered race- and gender-conscious affirmative action programs, the legal questions posed by such programs have been widely understood as difficult and close, but the majority opinion’s presentation does not do justice to the legal and historical arguments that have been articulated on both sides of the issue. In this respect, as well, I believe the majority opinion’s approach cannot help but detract from the persuasiveness and credibility of its ultimate ruling.
In the ballot pamphlet distributed to registered voters prior to the November 1996 election, the analysis prepared by the Legislative Analyst described as follows the effect of the adoption of Proposition 209: “This measure would eliminate state and local government affirmative action programs in the areas of public employment, public education, and public contracting to the extent these programs involve ‘preferential treatment’ based on race, sex, color, ethnicity, or national origin. The specific programs affected by the measure, however, would depend on such factors as (1) court rulings on what types of activities are considered ‘preferential treatment’ and (2) whether federal law requires the continuation of certain programs.” (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) Legis. Analyst’s analysis of Prop. 209, p. 30, italics added (Ballot Pamphlet).) The issue presented by this case is whether the particular affirmative action program here at issue “discriminates against” or “grants preferential treatment to” any individual or group on the basis of race or gender within the meaning of article I, section 31.
To resolve that question, it is unnecessary to venture back to the beginnings of our nation’s history, as the majority opinion does. Instead, I believe it is appropriate to turn first to the language of article I, section 31, and its contemporary background (as reflected in the ballot pamphlet materials that were before the voters when they were considering the measure), and then to review the specifics of the city’s challenged affirmative action program to determine whether the program violates this state constitutional provision.
II
Article I, section 31, subdivision (a)—the principal substantive provision of the initiative measure—provides in full: “The State shall not discriminate *581 against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.” Subdivision (f) of section 31 provides in turn: “For purposes of this section, ‘State’ shall include, but not necessarily be limited to, the State itself, any city, county, city and county, public university system, including the University of California, community college district, school district, special district, or any other political subdivision or governmental instrumentality of or within the State.”[2]
The city acknowledges that the provisions of article I, section 31, are applicable to the recently adopted public contracting affirmative action program that is challenged in this case. The city maintains, however, that the challenged aspects of its affirmative action program do not “discriminate against” or “grant preferential treatment to” any individual or group on the basis of the enumerated characteristics, as these quoted terms are used in article I, section 31. That constitutional measure contains no express definition of the terms “discriminate against” or “grant preferential treatment to” as used in the section, and, in deciding how that language properly should be interpreted, it is appropriate to consider the material relating to Proposition 209 contained in the ballot pamphlet that was distributed to all voters prior to the election to determine whether that material provides any guidance as *582 to how the voters are likely to have understood the meaning and effect of these terms. (See Ballot Pamp., supra, pp. 30-33.)[3]
I begin with the item in the ballot pamphlet materials that voters are most likely to have viewed as objective and impartial and to have consulted as a reliable indicator of the proposition’s meaning and effect—the in-depth analysis of Proposition 209 prepared by the Legislative Analyst. (See Elec. Code, § 9087.)[4] Past cases establish that a court properly may look to the analysis of the Legislative Analyst in determining the voters’ intent. (See, e.g., Legislature v. Eu (1991) 54 Cal.3d 492 [286 Cal.Rptr. 283, 816 P.2d 1309]; Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization (1978) 22 Cal.3d 208, 245-246 [149 Cal.Rptr. 239, 583 P.2d 1281].)
The initial section of the Legislative Analyst’s analysis of Proposition 209, entitled “Background,” reads in full: “The federal, state, and local governments run many programs intended to increase opportunities for various groups-—including women and racial and ethnic minority groups. These programs are commonly called ‘affirmative action’ programs. For example, state law identifies specific goals for the participation of women-owned and minority-owned companies on work involved with state contracts. State departments are expected, but not required, to meet these goals, which include that at least 15 percent of the value of contract work should be done by minority-owned companies and at least 5 percent should be done by women-owned companies. The law requires departments, however, to reject bids from companies that have not made sufficient ‘good faith efforts’ to meet these goals.
“Other examples of affirmative action programs include:
“• Public college and university programs such as scholarship, tutoring, and outreach that are targeted toward minority or women students.
“• Goals and timetables to encourage the hiring of members of ‘underrepresented’ groups for state government jobs.
*583 “• State and local programs required by the federal government as a condition of receiving federal funds (such as requirements for minority-owned business participation in state highway construction projects funded in part with federal money).” (Ballot Pamp., supra, Legis. Analyst’s analysis of Prop. 209, p. 30.)
After setting forth this background, the analysis goes on to describe the proposal embodied in Proposition 209: “This measure would eliminate state and local government affirmative action programs in the areas of public employment, public education, and public contracting to the extent these programs involve ‘preferential treatment’ based on race, sex, color, ethnicity, or national origin. The specific programs affected by the measure, however, would depend on such factors as (1) court rulings on what types of activities are considered ‘preferential treatment’ and (2) whether federal law requires the continuation of certain programs.” (Ballot Pamp., supra, Legis. Analyst’s analysis of Prop. 209, p. 30, italics added.) Although this passage makes it clear that were the proposition to be adopted, a court applying the measure would be required to determine whether or not a specific affirmative action program or policy granted “preferential treatment,” this initial passage does not identify any criteria, or provide any examples, to aid in determining that question.
Subsequent passages of the Legislative Analyst’s analysis, however, provide more guidance on this point. In discussing the potential fiscal effect of the passage of Proposition 209, the analysis contains separate sections discussing the measure’s effect upon state and local programs in the areas of (1) public employment and contracting, (2) public schools and community colleges, and (3) the University of California and the California State University. Each section identifies some types of affirmative action programs that, according to the analysis, likely would be affected by the passage of the proposition.
With regard to public employment and contracting, the analysis states: “The measure would eliminate affirmative action programs used to increase hiring and promotion opportunities for state or local government jobs, where sex, race, or ethnicity are preferential factors in hiring, promotion, training, or recruitment decisions. In addition, the measure would eliminate programs that give preference to women-owned or minority-owned companies on public contracts. Contracts affected by the measure would include contracts for construction projects, purchases of computer equipment, and the hiring of consultants. . . . [¶] The elimination of these programs would result in savings to the state and local governments. These savings would occur for *584 two reasons. First, government agencies no longer would incur costs to administer the programs. Second, the prices paid on some government contracts would decrease. This would happen because bidders on contracts no longer would need to show ‘good faith efforts’ to use minority-owned or women-owned subcontractors. Thus, state and local governments would save money to the extent they otherwise would have rejected a low bidder—because the bidder did not make a ‘good faith effort’—and awarded the contract to a higher bidder.” (Ballot Pamp., supra, Legis. Analyst’s analysis of Prop. 209, p. 31.)
With regard to public schools and community colleges, the analysis states that “the measure could eliminate, or cause fundamental changes to, voluntary desegregation programs run by school districts” (Ballot Pamp., supra, Legis. Analyst’s analysis of Prop. 209, p. 31, italics omitted), observing that “[e]xamples of desegregation spending that could be affected by the measure include the special funding given to (1) ‘magnet’ schools (in those cases where race or ethnicity are preferential factors in the admission of students to the schools) and (2) designated ‘racially isolated minority schools’ that are located in areas with high proportions of racial or ethnic minorities. . . . [¶] In addition, the measure would affect a variety of public school and community college programs such as counseling, tutoring, outreach, student financial aid, and financial aid to selected school districts in those cases where programs provide preferences to individuals or schools based on race, sex, ethnicity, or national origin. . . .” (Ibid.)
Finally, with regard to the University of California and the California State University, the analysis states: “The measure would affect admissions and other programs at the state’s public universities. For example, the California State University (CSU) uses race and ethnicity as factors in some of its admissions decisions. If this initiative is passed by the voters, it could no longer do so. . . . [¶] Both university systems also run a variety of assistance programs for students, faculty, and staff that are targeted to individuals based on sex, race, or ethnicity. These include programs such as outreach, counseling, tutoring, and financial aid. The two systems spend over $50 million each year on programs that probably would be affected by passage of this measure.” (Ballot Pamp., supra, Legis. Analyst’s analysis of Prop. 209, p. 31.)
One additional passage of the Legislative Analyst’s analysis also sheds light upon the voters’ likely understanding and intent with regard to the types of affirmative action programs that would be affected by the measure. After observing that its calculations suggest that the measure could affect *585 state and local programs that currently cost well in excess of $125 million annually, the analysis cautions that the actual amount of this spending that might be saved as a result of the passage of the measure could be considerably less than that amount for a variety of reasons, including the circumstance that “some programs we have identified as being affected might be changed to use factors other than those prohibited by the measure. For example, a high school outreach program operated by the UC [University of California] or the CSU [California State University] that currently uses a factor such as ethnicity to target spending could be changed to target instead high schools with low percentages of UC or CSU applications.” (Ballot Pamp., supra, Legis. Analyst’s analysis of Prop. 209, p. 31.)
In addition to the analysis of Proposition 209 prepared by the Legislative Analyst, the ballot pamphlet contained arguments in favor of and against Proposition 209 as well as accompanying rebuttal arguments submitted by the proponents and the opponents of the proposition. As a general matter, of course, ballot pamphlet arguments are intended as advocacy pieces, and voters undoubtedly are aware that such arguments may tend to overstate or exaggerate the benefits or detriments of a proposition and often are written in broad rhetorical terms that do not necessarily reflect the specific language or effect of the measure itself. As a consequence, a court must be cautious in considering such arguments and in attempting to gauge what weight the arguments properly should bear in the court’s interpretation of a proposition’s language. Nonetheless, because the pro and con arguments are part of the materials that were presented to the voters in the ballot pamphlet, it is appropriate to take note of the arguments to the extent they speak to the question before us. (See, e.g., Legislature v. Eu, supra, 54 Cal.3d 492, 505.)
The argument in favor of Proposition 209 begins: “A generation ago we did it right. We passed civil rights laws to prohibit discrimination. But special interests hijacked the civil rights movement. Instead of equality, governments imposed quotas, preferences, and set-asides. [¶] Proposition 209 is called the California Civil Rights Initiative because it restates the historic Civil Rights Act and proclaims simply and clearly: ‘The state shall not discriminate against, or grant preferential treatment to, any individual or group, on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.’ ” (Ballot Pamp., supra, argument in favor of Prop. 209, p. 32.) The argument in favor of Proposition 209 goes on to state: “Today, students are being rejected from public universities because of their Race. Job applicants are turned away because their Race does not meet some ‘goal’ or ‘timetable.’ Contracts are awarded to high bidders because they are of the preferred *586 Race, [¶] That’s just plain wrong and unjust. Government should not discriminate. It must not give a job, a university admission, or a contract based on race or sex. Government must judge all people equally, without discrimination.” The argument further states: “Discrimination is costly in other ways. Government agencies throughout California spend millions of your tax dollars for costly bureaucracies to administer racial and gender discrimination that masquerade as ‘affirmative action.’ They waste much more of your money awarding high-bid contracts and sweetheart deals based not on the low bid, but on unfair set-asides and preferences.” (Ibid.) Finally, the argument states: “Real ‘affirmative action’ originally meant no discrimination and sought to provide opportunity. That’s why Proposition 209 prohibits discrimination and preferences and allows any program that does not discriminate, or prefer, because of race or sex, to continue, [ft The only honest and effective way to address inequality of opportunity is by making sure that all California children are provided with the tools to compete in our society. And then let them succeed on a fair, color-blind, race-blind, gender-blind basis.” (Ibid.) As these excerpts indicate, although the argument in favor of Proposition 209 identified some types of affirmative action programs at which the measure was directed, the argument did not purport to define with any degree of specificity the factors that should be considered in determining whether a program “discriminates against” or “grants preferential treatment to” an individual or group on the basis of the prohibited characteristics.
In urging voters to vote against the proposition, the argument against Proposition 209 states: “California law currently allows tutoring, mentoring, outreach, recruitment, and counseling to help ensure equal opportunity for women and minorities. Proposition 209 will eliminate affirmative action programs like these that help achieve equal opportunity for women and minorities in public employment, education, and contracting.” The argument asserts that “[t]he initiative’s language is so broad and misleading that it eliminates equal opportunity programs including: [¶] [1] tutoring and mentoring for minority and women students; [¶] [2] affirmative action that encourages the hiring and promotion of qualified women and minorities; [¶] [3] outreach and recruitment programs to encourage applicants for government jobs and contracts; and [¶] [4] programs designed to encourage girls to study and pursue careers in math and science.” (Ballot Pamp., supra, argument against Prop. 209, p. 33.)
In the rebuttal to the argument against Proposition 209, the proponents of the measure took issue with the opponents’ characterization of the scope of the initiative, stating: “Don’t let them change the subject. Proposition 209 *587 bans discrimination and preferential treatment—period. Affirmative action programs that don’t discriminate or grant preferential treatment will be Unchanged. Programs designed to ensure that all persons—regardless of race or gender—are informed of opportunities and treated with equal dignity and respect will continue as before. [¶] Note that Proposition 209 doesn’t prohibit consideration of economic disadvantage. Under the existing racial-preference system, a wealthy doctor’s son may receive a preference for college admission over a dishwasher’s daughter simply because he’s from an ‘underrepresented’ race. That’s Unjust. The state must remain free to help the economically disadvantaged, but not on the basis of race or sex.” (Ballot Pamp., supra, rebuttal to argument against Prop. 209, p. 33.)
This overview of the ballot pamphlet materials relating to Proposition 209 makes several points clear. First, the measure’s principal purpose clearly was to limit the types of affirmative action programs that governmental entities could employ in three areas—public employment, public education, and public contracting. Second, the measure was not intended to preclude all governmental affirmative action programs within these areas, but rather was intended to prohibit only those affirmative action programs that discriminate against or grant preferential treatment to any individual or group on the basis of race or gender. Third, although neither article I, section 31, nor the accompanying ballot materials, expressly define the terms “discriminate against” or “grant preferential treatment to,” the ballot materials identify a variety of affirmative action programs, then currently employed by governmental entities, that it was anticipated probably would be prohibited were the initiative measure to be adopted. These examples afford helpful guidance in determining how the language of article I, section 31, should be interpreted in order to effectuate the voters’ intent.
As already noted, the city’s basic contention is that the affirmative action measures at issue in this case do not discriminate against or grant preferential treatment to any individual or group within the meaning of article I, section 31. To resolve that question, it is necessary to examine the specifics of the program at issue.
III
In the wake of the passage of Proposition 209, the City of San Jose revised its prior public contracting affirmative action program by adopting a new program incorporating a number of elements. Only a portion of the city’s program is challenged in this case, but it is useful to review the overall program in order to place the challenged provisions in context.
*588 As part of its revised public contracting affirmative action program, the city itself assumed a greater and more active role in conducting a variety of general outreach activities in order to make information about bidding opportunities on public contracts more available and accessible to all contractors and subcontractors in the community. The city’s current general outreach efforts include the following actions: (1) The city places the legal “Notice to Contract” in two local newspapers of general circulation, the San Jose Mercury News and the San Jose Post Record. (2) The city also places notices of the solicitation of bids for each project in all local builders’ exchanges, trade papers, and contractor and subcontractor organization papers. (3) In addition, the city places information in local builders’ exchanges and other locations, indicating which general contractors are intending to bid a particular project and are soliciting bids from subcontractors. (4) The city posts on the Internet additional information on the projects that are out to bid and on the general contractors that are soliciting subcontract bids. (5) Finally, the city operates a “Bid Hotline” to provide information on projects out to bid.
In addition to these general outreach measures that are conducted by the city itself to increase knowledge of and access to the public contracting process, the city determined that—in light of a earlier study of the local public contracting process that documented a historical pattern of discrimination by prime contractors against minority-owned and women-owned subcontractors (referred to as MBE and WBE subcontractors) with regard to public contracts awarded by the city—it was appropriate to adopt a “Nondiscrimination/Nonpreferential Treatment Program.” This program imposes a number of requirements on prime contractors that wish to submit bids on public works construction contracts having a cost estimate in excess of $50,000.
First, the program requires each prime subcontractor to submit, along with its bid, a signed statement attesting that “[i]n listing subcontractors in this bid, I have not discriminated against or given any preference to any firm based on race, sex, color, age, religion, sexual orientation, disability, ethnicity, or national origin” and acknowledging that any such discrimination or preference would violate a city ordinance. Second, to more particularly address the historical discrimination against MBE/WBE subcontractors, the program requires all prime contractors to satisfy a separate requirement by providing either “Documentation of Outreach” or “Documentation of Participation.” It is the legal validity of these two components—the Documentation of Outreach component and the Documentation of Participation component—to which the challenge in this case is directed.
*589 In order to satisfy the Documentation of Outreach option, a prime contractor must send written notice to not less than four MBE/WBE subcontractors in each appropriate trade area identified for the project, informing the notified subcontractors of the prime contractor’s interest in bidding on the contract. This notice must be sent to the MBE/WBE subcontractors at least 10 days prior to the opening of bids. In addition, the prime contractor must follow up the written notice by contacting, or by making at least three attempts to contact, each of the MBE/WBE subcontractors to determine whether the subcontractor is interested in participating in the project. Finally, if any MBE/WBE subcontractor expresses interest in participating, the prime contractor must negotiate in good faith with the subcontractor and may not unjustifiably reject any bid prepared by an MBE/WBE subcontractor.[5] Under the program, a prime contractor need submit with its bid only copies of the required written notices that it has provided to the requisite number of MBE/WBE subcontractors. Although the program also requires the prime contractor to document its compliance with the remaining requirements of this option (i.e., the follow-up contacts with MBE/WBE subcontractors, and the contractor’s reason for rejecting a proposal made by the MBE/WBE subcontractors it has contacted), that additional documentation need not be submitted with the prime contractor’s bid and need only be produced by the prime contractor in the event of a subsequent investigation by the city.
As an alternative to fulfilling the demands of the Documentation of Outreach option, a prime contractor instead may satisfy the requirements of the Documentation of Participation component. Under this option, for each public works construction contract that falls within the reach of the Nondiscrimination/ Nonpreferential Treatment Program, the city’s Office of Equality Assurance “establishes, as an evidentiary presumption,” the percentage of MBE/WBE firms “that would be expected to be included in the Base Bid . . . in the absence of discrimination.” A prime contractor satisfies the Documentation of Participation option by listing in its bid a sufficient number of MBE/WBE subcontractors to satisfy this “evidentiary presumption.” If a prime contractor decides to use a sufficient number of MBE/WBE subcontractors in its bid to meet the figure established by the city, the prime contractor is not required either to undertake or to document any steps with regard to outreach.
*590 As already noted, the legal challenge in this case is directed only to the Documentation of Outreach or Documentation of Participation elements of the city’s program. The city maintains that neither of these elements “discriminates against” or “grants preferential treatment to” any subcontractor within the meaning of article I, section 31. I address each component separately, beginning with the Documentation of Participation.
IV
With regard to the Documentation of Participation component, plaintiff contends that this feature of the city’s program operates in a fashion similar to a set-aside or quota and clearly is invalid under article I, section 31. The city, by contrast, defends the participation option as an appropriate means of establishing a presumption of nondiscrimination that warrants relieving a contractor of the obligations imposed by the outreach component. In support of its position, the city maintains that the participation component, by utilizing an evidentiary presumption, is analogous to affirmative action programs that have been found to be permissible under Title VII. (See, e.g., Associated Pennsylvania Constructors v. Jannetta (M.D.Pa. 1990) 738 F.Supp. 891, 892-893.) As I shall explain, I agree with plaintiff’s claim that the Documentation of Participation component grants “preferential treatment” within the meaning of article I, section 31.
To begin with, the city’s reliance upon the similarity of the participation component to programs that have been found permissible under Title VII clearly is without merit. Although the city points to a few passages in the ballot arguments in favor of Proposition 209 that it suggests support the position that article I, section 31, should be interpreted consistently with Title VII,[6] in reality, as explained below, the language of article I, section 31, differs significantly from that of Title VII. Indeed, the entire background of article I, section 31—as reflected in the ballot pamphlet materials—demonstrates that the principal purpose of Proposition 209 was to prohibit governmental entities in California, in the areas of public employment, public education, and public contracting, from utilizing many of the kinds of affirmative action programs that had been held permissible under Title VII.
By their explicit terms, the principal statutory provisions of Title VII prohibit employers and labor unions only from “discriminat[ing] against” *591 persons on the basis of race, color, religion, sex or national origin; these provisions do not refer specifically to granting preferential treatment to persons on the basis of race or gender. (42 U.S.C. §§ 2000c-2(a), 2000c-2(d).)[7] In Steelworkers v. Weber, supra, 443 U.S. 193 (Weber), the United States Supreme Court relied in part on the absence in Title VII of an explicit statutory prohibition on granting preferential treatment on the basis of race in concluding that Title VII should not be interpreted to bar private employers from voluntarily implementing affirmative action programs that rely upon race-conscious preferences to attempt to overcome a substantial disparity in employment positions from which minorities and women historically have been excluded. As noted by the court in Weber, although the principal provisions of Title VII refer only to discrimination and not to preferential treatment, a separate provision of Title VII specifically addresses the question of preferential treatment, and provides simply that “[n]othing contained in this subchapter shall be interpreted to require any employer ... to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer . . . .” (42 U.S.C. § 2000c-2(j), italics added.) Observing that “[h]ad Congress meant to prohibit all race-conscious affirmative action, as respondent urges, it easily could have . . . provided] that Title VII would not require or permit racially preferential integration efforts” (443 U.S. at p. 205 [99 S.Ct. at p. 2728], italics in original), and noting that this latter provision “does not state that ‘nothing in Title VII shall be interpreted to permit’ voluntary affirmative efforts to correct racial imbalances” (id. at p. 206 [99 S.Ct. at p. 2728], italics in original), the court’s opinion in Weber concluded that “[t]he natural inference is that Congress chose not to forbid all voluntary race-conscious affirmative action.” (Ibid.) Accordingly, the high court ultimately held in Weber “that Title VII’s prohibition . . . against racial discrimination does not condemn all private, voluntary, race-conscious affirmative action plans.” (Id. at p. 208 [99 S.Ct. at p. 2729].)
The proponents and drafters of Proposition 209 unquestionably intended to incorporate into the California Constitution a rule different from that *592 which the United States Supreme Court in Weber concluded is embodied in Title VII. Unlike Title VII, article I, section 31, expressly prohibits governmental entities from either “discriminat[ing] against” or “grant[ing] preferential treatment to” any person or group on the basis of race or gender. Thus, contrary to plaintiff’s argument, the circumstance that a particular type of affirmative action program has been found permissible under Title VII does not provide a sound basis for concluding that the program also is permissible under article I, section 31.
Looking to the specifics of the particular Documentation of Participation component at issue, it appears clear that in practice this option will operate to create a strong incentive for prime contractors, in selecting among subcontractors, to grant preferential treatment to at least some MBE and/or WBE subcontractors in order to meet the percentage figure specified by the city. A prime contractor will be encouraged to follow such a course both in order to avoid the necessity of complying with the somewhat burdensome procedural requirements of the outreach component and also in order to avoid the potentially significant adverse sanctions (such as the loss of the right to bid on city projects for a specified period of time) that might be imposed under the outreach option if a contractor is found to have unjustifiably rejected the proposal of an MBE/WBE subcontractor.
Although the city maintains that, by requiring the contractor to certify that it has neither discriminated against nor granted preference to any firm on the basis of race or gender, its program guards against the risk that a prime contractor might grant preferential treatment to an MBE/WBE subcontractor, in view of the practical difficulty of policing such self-serving representations it is unrealistic to suggest that that the certification process affords an adequate safeguard. When the participation component is viewed from a practical and commonsense perspective, I believe it is clear that the Documentation of Participation component is likely to operate in a manner analogous to a prescribed set-aside or goal—one of the basic types of affirmative action measures at which article I, section 31, was directed. Accordingly, I conclude that the Documentation of Participation component violates article I, section 31, because it effectively operates to grant “preferential treatment” to subcontractors on the basis of race or gender.
V
In defending the validity of the alternative Documentation of Outreach component, the city maintains that the term “preferential treatment” in article I, section 31, should be interpreted to preclude only preferential *593 treatment in the actual selection process itself, as occurs, for example, in programs that designate race or gender a “plus” factor in evaluating candidates or in programs that establish goals or set-asides specifying the percentage or number of applicants or candidates expected to be hired for a job, awarded a government contract, or admitted to a school. The city asserts that the term “preferential treatment” should not be interpreted to apply to outreach programs (including “targeted” outreach programs) that simply expand the pool of candidates or applicants who are provided access to opportunities in public employment, public contracts or a public school but that do not afford preferential treatment on the basis of race or gender in the actual selection process itself.
In support of its position, the city heavily relies upon Lungren v. Superior Court (1996) 48 Cal.App.4th 435, 442 [55 Cal.Rptr.2d 690] (Lungren). The Lungren decision, which was handed down three months prior to the vote on Proposition 209, involved a preelection challenge to the wording of the Attorney General’s title and summary of Proposition 209 that was to appear on the election ballot. In Lungren, the challengers contended that the Attorney General’s summary was potentially misleading because it simply tracked the language of Proposition 209 and did not specifically state that the measure would prohibit affirmative action programs conducted by state and local government. The trial court agreed with the challengers that the summary was misleading in failing to “ ‘reflect that the chief purpose of the measure is to prohibit affirmative action programs by public entities that are inconsistent with the prohibition in the measure’ ” (48 Cal.App.4th at p. 437) and ordered a change in the ballot title and summary. The Court of Appeal, however, acting in an expedited writ proceeding, overturned the trial court’s determination, concluding that the failure to include the term “affirmative action” in the Attorney General’s title and summary of Proposition 209 did not render the title or summary improper or misleading.
In reaching its conclusion in Lungren, the Court of Appeal observed that the term “affirmative action” is ambiguous and that “[m]ost definitions of the term would include not only the conduct which Proposition 209 would ban, i.e., discrimination and preferential treatment, but also other efforts such as outreach programs. [Citations.] Accordingly, any statement to the effect that Proposition 209 repeals affirmative action programs would be overinclusive and hence ‘false and misleading.’ ” (Lungren, supra, 48 Cal.App.4th at p. 442, italics added.)
The city, seizing upon the italicized language in the above quoted passage, asserts that the Court of Appeal’s decision in Lungren constitutes a definitive *594 judicial ruling that no outreach program falls within the reach of article I, section 31. The city argues that when the voters thereafter approved Proposition 209, they must be presumed, under established legal principles, to have done so in light of the interpretation of the measure adopted in Lungren. Accordingly, the city argues that article I, section 31, should be interpreted as inapplicable to any outreach program.
In my view, the city’s argument plainly rests on an inaccurate and overbroad reading of the language used by the Court of Appeal in Lungren. In stating that most definitions of affirmative action would include not only programs that discriminate against or grant preferential treatment, but also outreach programs, Lungren did not suggest that no outreach program properly could be found to discriminate against or grant preferential treatment within the meaning of article I, section 31. Reasonably interpreted, the quoted passage in Lungren simply explains that because there are some affirmative action programs, including some outreach programs, that do not involve discrimination or preferential treatment on the basis of race or gender, a title and summary of Proposition 209 that indicated the initiative generally would repeal affirmative action programs would itself be over-broad and misleading. The quoted passage in Lungren does not refer to, much less purport to decide, whether a “targeted outreach” program, i.e., an outreach program directed solely to individuals or groups on the basis of race or gender, would constitute discrimination or preferential treatment within the meaning of the proposition.
The city maintains, however, that it is disingenuous to suggest that a program that does not involve race-conscious or gender-conscious components would be viewed or understood to be an “affirmative action” program. I strongly disagree. The term “affirmative action” has been employed in a general way to describe a great variety of proactive programs instituted by an entity in an attempt to remedy segregated programs or to overcome a legacy of discrimination or exclusion. (See, e.g., Holzer & Neumark, Assessing Affirmative Action (Sept. 2000) 38 J. Econ. Literature 483, 484.) Such proactive efforts need not necessarily involve race-conscious or gender-conscious measures, but rather can include efforts relating to broad, general outreach to the entire community, including portions of the community that have not been solicited or granted access in the past. The outreach program that was before this court in Domar Electric, Inc. v. City of Los Angeles (1994) 9 Cal.4th 161 [36 Cal.Rptr.2d 521, 885 P.2d 934], requiring contractors bidding on public contracts to undertake “reasonable good faith outreach to all types of subcontractor enterprises” (id. at p. 174), provides a good example of a general, nontargeted outreach program that ordinarily would be considered an affirmative action program.
*595 Accordingly, I conclude that the Court of Appeal’s opinion in Lungren, supra, 48 Cal.App.4th 435, does not support the city’s claim that the Documentation of Outreach component of its program cannot properly be considered as granting preferential treatment under article I, section 31, simply because its provisions do not require a contractor to grant preferential treatment to MBE/WBE’s in the selection process but instead impose only an obligation of targeted outreach.
Indeed, contrary to the city’s suggestion that the electors who voted in favor of Proposition 209 should be presumed to have understood that the passage of the measure would not affect the validity of targeted outreach efforts in the areas—public employment, public education, and public contracting—covered by the measure, the materials relating to Proposition 209 contained in the ballot pamphlet provided a rather clear indication that outreach efforts that are targeted toward individuals or groups on the basis of race or gender were likely to fall within the reach of the proposition.
As noted above, in discussing the probable fiscal effect of the passage of Proposition 209, the analysis prepared by the Legislative Analyst discussed a number of then existing affirmative action programs that likely would be affected by the measure. Regarding the effect on public schools and community colleges, the analysis stated in part: “[T]he measure would affect a variety of public school and community college programs such as counseling, tutoring, outreach, student financial aid, and financial aid to selected school districts in those cases where the programs provide preferences to individuals or schools based on race, sex, ethnicity, or national origin. Funds spent on these programs total at least $15 million each year.” (Ballot Pamp., supra, Legis. Analyst’s analysis of Prop. 209, p. 31, italics added.) Similarly, in discussing the effect of the measure on the University of California and the California State University, the analysis stated: “Both university systems also run a variety of assistance programs for students, faculty, and staff that are targeted to individuals based on sex, race, or ethnicity. These include programs such as outreach, counseling, tutoring, and financial aid. The two systems spend over $50 million each year on programs that probably would be affected by passage of this measure.” (Ibid., italics added.) Finally, in cautioning that its estimate of the total savings that would result from passage of the initiative could be considerably less for a variety of reasons, the analysis pointed to the following as one such circumstance: “[S]ome programs we have identified as being affected might be changed to use factors other than those prohibited by the measure. For example, a high school outreach program operated by the UC or the CSU that currently uses a factor such as ethnicity to target spending could be changed to target *596 instead high schools with low percentages of UC or CSU applications.” (Ibid., italics added.)
In light of the analysis of Proposition 209 contained in the ballot pamphlet, it is clear that the voters reasonably would have believed that an outreach program targeted to specific individuals or groups on the basis of their race or gender would be considered a program that grants preferential treatment within the meaning of article I, section 31. Interpreting the language of article I, section 31, to effectuate the voters’ intent, we must conclude that an outreach program directed to an audience on the basis of its members’ race or gender constitutes a program that grants preferential treatment for purposes of article I, section 31.
In view of this conclusion, it is clear that the Documentation of Outreach component that is challenged in this case violates the newly enacted constitutional provision. As noted, the outreach component in question places an obligation on prime contractors to solicit bids from, and make follow-up contacts to, a specified number of MBE or WBE subcontractors, but the provision places no similar obligation on prime contractors to undertake outreach efforts to non-MBE or non-WBE subcontractors. This aspect of the outreach component in itself grants preferential treatment to subcontractors on the basis of race and gender. Moreover, the city’s outreach component contains an additional feature that requires a prime contractor to negotiate in good faith with—and to justify any rejection of an offer made by—any one of the MBE/WBE subcontractors that expresses an interest in participating in the project, while the provision places no similar requirements upon a prime contractor with regard to proposals made by a non-MBE or non-WBE subcontractor. These additional features of the outreach component similarly grant preferential treatment to subcontractors on the basis of race or gender, and indeed, as a practical matter, may well create a significant incentive for a prime contractor to grant preferential treatment to an MBE/WBE subcontractor that expresses interest in participating in the project, in order to avoid a claim that the contractor’s negotiation or justification for rejection was inadequate.
Accordingly, I conclude that the Documentation of Outreach component of the city’s program is invalid under article I, section 31.
VI
Although this court has concluded that the two components of the city’s public contracting program that are challenged in this case violate article I, section 31, this determination should not obscure the important point that *597 this constitutional provision does not prohibit all affirmative action programs or preclude governmental entities in this state from initiating a great variety of proactive steps in an effort to address the continuing effects of past discrimination or exclusion, and to extend opportunities in public employment, public education, and public contracting to all members of the community.
Indeed, the numerous additional features of the public contracting outreach program that the city recently has put in place, and that have not been challenged in this proceeding, provide ready examples of just a few of the many forms of affirmative action that clearly are consistent with the provisions of article I, section 31. Expanding advertising of public contract bidding opportunities in newspapers of general circulation and special trade journals, establishing public contract hotlines, and creating Web sites to disseminate information to previously nonparticipating subcontractors in order to facilitate the submission of proposals to prime contractors who are contemplating submitting a bid on a project—all these are permissible means by which a governmental entity may attempt to expand the pool of persons to whom public contracts are awarded. In addition, there are many other strategies that may be implemented by governmental entities that similarly appear to present no danger of running afoul of the precepts embodied in article I, section 31, such as dividing large public contracts into smaller segments in order to facilitate participation by new or more modest enterprises.
Furthermore, a public contracting program that imposes an obligation on a prime contractor to engage in reasonable, good faith outreach to all types of subcontractor enterprises in a community, like the outreach program upheld by this court prior to the adoption of Proposition 209 in Domar Electric, Inc. v. City of Los Angeles, supra, 9 Cal.4th 161, represents another example of a permissible affirmative action outreach program that does not discriminate against or grant preferential treatment on the basis of race or gender.[8] As the proponents of Proposition 209 made clear in their rebuttal to the argument
*598 against the initiative measure: “Proposition 209 bans discrimination and preferential treatment—period. Affirmative action programs that don’t discriminate or grant preferential treatment will be Unchanged. Programs designed to ensure that all persons—regardless of race or gender—are informed of opportunities and treated with equal dignity and respect will continue as before." (Ballot Pamp., supra, rebuttal to argument against Prop. 209, p. 33, italics added.)
VII
For the reasons set forth above, I conclude that the judgment of the Court of Appeal should be affirmed.
Werdegar, J., concurred.
*599 Appendix to Concurring and Dissenting Opinion of George, C. J.
[[Image here]]
*600 [[Image here]]
*601 [[Image here]]
*602 [[Image here]]

For convenience, in this opinion I shall use the phrase “race or gender” as a shorthand term that refers to all of the categories listed in article I, section 31—i.e., “race, sex, color, ethnicity, or national origin.” (Cal. Const., art. I, § 31, subd. (a).)

Article I, section 31, reads in full:
“(a) The State shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.
“(b) This section shall apply only to action taken after the section’s effective date.
“(c) Nothing in this section shall be interpreted as prohibiting bona fide qualifications based on sex which are reasonably necessary to the normal operation of public employment, public education, or public contracting.
“(d) Nothing in this section shall be interpreted as invalidating any court order or consent decree which is in force as of the effective date of this section.
“(e) Nothing in this section shall be interpreted as prohibiting action which must be taken to establish or maintain eligibility for any federal program, where ineligibility would result in a loss of federal funds to the State.
“(f) For the purposes of this section, ‘State’ shall include, but not necessarily be limited to, the State itself, any city, county, city and county, public university system, including the University of California, community college district, school district, special district, or any other political subdivision or governmental instrumentality of or within the State.
“(g) The remedies available for violations of this section shall be the same, regardless of the injured party’s race, sex, color, ethnicity, or national origin, as are otherwise available for violations of then-existing California antidiscrimination law.
“(h) This section shall be self-executing. If any part or parts of this section are found to be in conflict with federal law or the United States Constitution, the section shall be implemented to the maximum extent that federal law and the United States Constitution permit. Any provision held invalid shall be severable from the remaining portions of this section.”

The section of the ballot pamphlet relating to Proposition 209 is set forth in full in an appendix to this opinion. The text of Proposition 209, which was set forth in a separate section at the end of the ballot pamphlet, has been omitted from the appendix.

Elections Code section 9087 provides in relevant part: “The Legislative Analyst shall prepare an impartial analysis of the measure describing the measure and including a fiscal analysis of the measure showing the amount of any increase or decrease in revenue or cost to state or local government. . . . The analysis shall be written in clear and concise terms, so as to be easily understood by the average voter, and shall avoid the use of technical terms wherever possible. The analysis may contain background information, including the effect of the measure on existing law and the effect of enacted legislation which will become effective if the measure is adopted, and shall generally set forth in an impartial manner the information the average voter needs to adequately understand the measure. . . .”

Although the terms of the program do not further explain the circumstances under which a prime contractor will be found not to have negotiated in good faith or a contractor’s rejection of an MBE/WBE subcontractor’s proposal will be found to be unjustifiable, the record indicates that the city interprets these requirements simply as prohibiting a prime contractor from rejecting a subcontractor’s proposal on the basis of race, gender, or one of the other prohibited bases.

The city cites two brief excerpts from the proponents’ arguments: (1) the statement in the argument in favor of Proposition 209 declaring that “Proposition 209 is called the California Civil Rights Initiative because it restates the historic Civil Rights Act. . . .” (Ballot Pamp., supra, argument in favor of Prop. 209, p. 32), and (2) a sentence contained in the rebuttal to the argument against Proposition 209 stating that “[a]nyone opposed to Proposition 209 is opposed to the 1964 Civil Rights Act.” (Ballot Pamp., supra, rebuttal to argument against Prop. 209, p. 33.)

Title 42 United States Code section 2000c-2(a), provides in relevant part: “It shall be an unlawful employment practice for an employer— [¶] (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s race, color, religion, sex, or national origin . . . .” (Italics added.)
Title 42 United States Code section 2000c-2(d), provides in relevant part: “It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship ... to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.” (Italics added.)

As noted above, in addressing the fiscal effect of Proposition 209, the analysis by the Legislative Analyst stated that the amounts paid on some government contracts would decrease if the initiative were adopted, because “bidders on contracts no longer would need to show ‘good faith efforts’ to use minority-owned or women-owned subcontractors. Thus, state and local governments would save money to the extent they otherwise would have rejected a low bidder—because the bidder did not make a ‘good faith effort’—and awarded the contract to a higher bidder.” (Ballot Pamp., Gen. Elec., supra, Legis. Analyst’s analysis of Prop. 209, p. 31.)
This comment cannot properly be interpreted to suggest that every affirmative action program that includes an outreach element requiring a good faith effort by a prime contractor would violate article I, section 31. The comment in the analysis relates solely to programs in *598 which the required good faith effort is directed at individuals or firms on the basis of race or gender. Because article I, section 31, prohibits only those actions that discriminate or grant preferential treatment to persons of groups on the basis of these prohibited categories, an outreach program (such as the program addressed in Domar) that is not based on those characteristics would not violate the constitutional provision, even if it contains a good faith effort component.